**Douglas GOMES et al.**

v.

**Anthony P. TRAVISONO, Individually and in his capacity as Director of the Department of Corrections for the State of Rhode Island, et al.**

**Civ. A. No. 4794.**

United States District Court,
D. Rhode Island.
Jan. 16, 1973.

Cary J. Coen, John M. Roney, Gary Yesser, of Rhode Island Legal Services, Providence, R. I., Max Stern, Boston, Mass., Alton W. Wiley, Providence, R. I., for plaintiffs; Haywood Burns, National Conference of Black Lawyers, Stanley A. Bass, New York City, of counsel.

Richard J. Israel, Atty. Gen. of R. I., W. Slater Allen, Jr., Asst. Atty. Gen., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

In a prison atmosphere of tension prevailing in the months after the Attica uprising, the Rhode Island Adult Correctional Institution on November 18, 1971 shipped eleven inmates out to federal and state prisons throughout the country. Suspected of involvement in a plot to disrupt the prison, the inmates were summarily transferred out of state late in the evening, without prior notice or opportunity to contact family or counsel. The inmates were not told the reason for the transfer nor were they given an opportunity to state why they should not be transferred. These transfers precipitated this civil rights action, brought by and on behalf of Rhode Island male prisoners, and challenging the constitutionality of out of state transfers per se and of the procedures under which such transfers are accomplished.

The named plaintiffs in this class action are inmates who have been transferred to prisons out of Rhode Island. All were transferred without their consent. Some were transferred to distant prisons in the federal system under the authority of 18 U.S.C. § 5003 and R.I.G. L. § 13–12–1 (1956, 1969 Reenactment). Others were transferred to prisons in other New England states under the New England Interstate Corrections Compact, R.I.G.L. § 13–11–1 et seq. Transfers are accomplished without advance written notice, without statement of reasons for the transfer, and without a hearing in the inmate's presence. Usually the inmate is not given any advance notice that he will be transferred.

The plaintiffs contend that involuntary removal of a prisoner from Rhode Island who was sentenced under Rhode Island law violates the Eighth Amendment's ban on cruel and unusual punishment. Alternatively they argue that an involuntary out-of-state transfer without prior notice and hearing violates the due process and equal protection clauses of the Fourteenth Amendment. Transfers without written rules and regulations guaranteeing access to counsel violate, they argue, the First, Sixth, and Fourteenth Amendments. Plaintiffs urge a finding that out-of-state transfers are illegal unless an investigation is made of the rehabilitative aspects of the receiving institution. Finally, they argue that the decision to transfer inmates on November 18, 1971, was irrational, arbitrary, and capricious, in violation of the Fourteenth Amendment.

Jurisdiction is based on 28 U.S.C. § 1343; the cause of action is based on 42 U.S.C.A. § 1983. A hearing was held on merged preliminary and permanent relief.

Defendants include the Director of the Department of Corrections and the Attorney General of Rhode Island, both of whom have the statutory authority to transfer inmates.[1] No written stand-

---

1. The action was originally brought against John J. Affleck, the Director of the Department of Social and Rehabilitative Services for Rhode Island, and John Sharkey, the Assistant Director for Corrections of this Department. Since the institution of this lawsuit, the state government has been reorganized to put ad-

ards govern the procedures for transfer nor are there any written regulations providing for the return to Rhode Island of transferred inmates for parole hearings or court proceedings.

Reconstruction of the events leading to the transfer is not difficult; reconstruction of the true causes of the transfer is uncertain; reconstruction of what actually was happening at the prison prior to the November 18, 1971 transfers is well nigh impossible. The testimony presents sharp conflicts of stories and these findings of fact necessarily depend on the Court's assessment of the credibility of witnesses.

The atmosphere at the Adult Correctional Institution in the Fall of 1971 was one of tension and confrontation. The uprising and bloody retaking of the prison at Attica, New York, in September of 1971, put both the staff and the inmates of the A.C.I. on edge. The correctional officers of the prison staged a work strike in late October, seeking stronger disciplinary measures. Racial tensions in the prison mounted and confrontations between militant black inmates and staff began to occur. A month before the November 18 transfers, blueprints and materials for making a bomb were found in the prison, and these exacerbated fears. Finally, many of the older, experienced correctional officers had retired and young, unseasoned officers were left at work in the prison.

An Afro-American Society had become active at the A.C.I. It existed to promote the welfare of the black inmates, and most of its activities were geared to educational programs. The

Society also attempted to find jobs for black inmates on their release from the A.C.I. Most of the convicted black inmates at the A.C.I. belong to the Society and it attempts to police its own members about compliance with prison rules. Dennis Gomes was President of the Society; Richard Harris, Vice-President; Frederick Taylor, Presidential Advisor; all were transferred on November 18, 1971. The Society felt that there were conditions in the prison regarding black inmates which needed to be remedied, and arranged a meeting with the Warden on November 8 to discuss their grievances.[2] At the meeting a list of grievances was presented to the Warden, and some eight or nine of the items were discussed. The Warden seemed receptive enough and understanding. The meeting lasted a few hours, and when the Warden left, he agreed to meet again with inmates on the next Monday, November 15. The Warden took the list of grievances home with him and did not discuss them with others.

Undoubtedly for the reasons that follow, the Warden did not attend the November 15 meeting. The members of the Afro-American Society were concerned that the Warden had not come to the meeting, and, on November 16, the Society decided to send the Warden a letter. One letter was drafted and was rejected by the membership as being aggressive. The Society decided to contact the Warden and to try and continue the discussions.

The Warden had taken a few days off and when he returned to the prison on November 15 he was told by Deputy Warden Remillard and Assistant Warden Houle that there was a plot afoot.[3]

ministration of the prisons under the control of a new Department of Corrections. The Director of the Department of Corrections is Anthony P. Travisono. John Sharkey has been dropped as a defendant. Appropriate substitution of parties has been made. Fed.R.Civ.P. 25-(d).

2. The grievances included such items as the hiring of more black personnel, participation of black staff on disciplinary

boards, addition of a soul and pork free diet, and support for legislative proposals.

3. By the time Warden Howard was informed of the "plot," Houle and Remillard had also informed John Sharkey, Assistant Director for Corrections and John Affleck, Director of the Department of Social and Rehabilitative Services of their information. Houle and Remillard believed that they would be the hostages

Remillard said he had information that the Afro-American Society was going to cause a serious disruption, which would be triggered by the presentation of "impossible demands," and that hostages might be taken. In conjunction with this disruption, several inmates would attempt to escape. The information was obtained from informants and prison personnel. There were, at least, several different versions of the plot, and the different versions were sometimes inconsistent. The Warden attempted to get eavesdropping devices so that he could check on the reported stories, but was unsuccessful.

During the next few days there were a series of meetings about the alleged plot which were attended by state and prison officials. On November 17 the decision to transfer was made, principally by Warden Howard, Remillard, Houle, and Sharkey. Warden Howard testified that thousands of factors go into the decision to transfer, including the inmate's rate of rehabilitation, his participation in treatment programs, his sentence, background, history, and family. The histories of a few of the eleven transferred had led the Warden, according to his testimony, to consider possible transfer of them before the plot allegations arose. It never occurred to the Warden that the "impossible demands" of the plotters might be nothing more than the list of grievances he received from the Afro-American Society.

Julio Costa, a guard at the A.C.I. and the advisor to the Afro-American Society, was close to the members of the Society. He attended the meeting with the Warden, and to his knowledge, the Society prepared no other lists of grievances than those presented to the Warden and prepared no list of demands. No member of the prison administration asked Mr. Costa whether he had heard of the alleged plot. Mr. Costa testified in Court that between November 1 and November 18 he never heard of any plot by the Society to disrupt or take hostages. He felt he was in a position to know of a plot if such existed.

The plaintiffs who testified all flatly denied any involvement in a plot to disrupt the prison or take hostages. All of them maintained that they were never told the reason for the transfers and knew of no reason.

Testimony of Leo Carroll, a sociologist who had been studying race relations at the prison and had become friendly with the Warden, throws considerable doubt on whether the Warden actually believed there was a conspiracy which threatened the prison. The recounting of Mr. Carroll's conversations with the Warden indicate that the momentum of the situation led the Warden to go along with the transfers, although he was doubtful of the conspiracy and would have wanted a more detailed investigation into the reports of a conspiracy.

Late in the evening of November 18, 1971, eleven inmates were individually taken from their cells; [some] were stripped to their underwear; were handcuffed, shackled, and chained; and were taken by state police car to prisons in other states. The eleven were Douglas Gomes, Dennis Gomes, Frederick Taylor, Henry Bussey, Thomas Goff, Gerard Ouimette, Richard Harris, Ronald Sweet, Ray Blais, Richard DeFreitas, and James Silvia. Eight of these inmates were suspected of involvement in the plot. Other inmates who were also named as plotters were not transferred. The reason given for this is that receiving institutions were found for only eleven inmates. Four of the transferred inmates were white; the rest, black. Most of the black inmates were active in the Afro-American Society. The white inmates were not particularly friendly with the black inmates; some had, in fact, been involved in racial altercations at the prison. According to the reports,

taken. When the Warden returned to the A.C.I. on November 15, both the officers under him and his superiors were involved in determining what should be the appropriate response to the "plot."

these white inmates were going to take advantage of the planned disruption to escape. It is conceded that the transfer of two of the inmates, Sweet and Ouimette, was a mistake. These two were not named as plotters and were transferred a few days before they were to stand trial. Receiving institutions included, inter alia, Leavenworth, Kansas; Atlanta, Georgia; Marion, Illinois; and Thomaston, Maine.

In the years before November of 1971 there were twenty-five transfers of Rhode Island inmates out-of-state, only four of which were involuntary. There have been several involuntary transfers of inmates since the November, 1971 transfers. In November of 1969, Douglas Gomes and Harold Summerour were transferred to Massachusetts. Sweet and Ouimette had been transferred to Massachusetts earlier in 1971 and had been returned to the A.C.I. by Massachusetts without Rhode Island's consent.

A common pattern emerges from the stories of each of the transferred inmates. Usually, the inmates were placed in administrative segregation at the receiving institution, lasting from two to six weeks. During this segregation period the inmates were rarely released from their cells, and were often kept in cells used for disciplinary punishment. After a period of time, they were brought before classification boards. Often they were asked why they had been transferred and prison officials did not believe their responses that they did not know. Eventually the inmates were put into the population, albeit the populations at the receiving institutions were sometimes ill matched in terms of age or racial composition.

A few of the inmates' records followed them from the A.C.I., but the new institutions frequently had to ask for more information. While the only explanation given for the transfer on the classification records was "for the good of the institution," letters from Warden Howard characterized some of the inmates as militant leaders of a threatened uprising. Because their records did not follow them, the inmates were placed in work assignments and programs not consonant with their individual development. In at least one instance a transferred inmate was precluded from participation in the rehabilitative programs of the new prison precisely because he was from out of state. As was noted by one prison official at a receiving institution, the difficulties the inmates had in adjusting to their new environments may have been compounded by the resentment they felt over being transferred.

The mail censorship regulations at the receiving institutions were more stringent than those at the A.C.I. At first, some of the inmates were not allowed to send any mail out. Mail to attorneys was also censored; and, in at least one instance, this censorship inhibited an inmate's communication with his counsel. Transferred inmates were not allowed to write inmates at the A.C.I.

Although several inmates had legal proceedings pending, none of them saw their attorneys while they were out of state, as they had done while in Rhode Island. Some had occasional visits from family and friends while out of state, but the visits were far fewer than they had enjoyed in Rhode Island.

Frequently the transferred inmates met hostility from inmates at the new prisons—perhaps because they were thought to be "stool pigeons" transferred for protective reasons. Sometimes younger than the population at the receiving institutions, some inmates were subject to homosexual overtures, as they had not been in Rhode Island.

Generally, the rehabilitative programs, psychological therapy sessions, and educational programs at the receiving institution were not made available to the transferred inmates. They received less pay or no pay for their work at the new institutions. They were not allowed to have their personal belongings from the A.C.I., nor were the funds from their personal savings made available to them for several months.

One black inmate was transferred to a prison with an almost entirely white population and had to be locked up in protective custody to stop his harassment by white inmates. This inmate spent more than a month in a small solitary cell with no sink, no bed, and a bucket for a toilet. In one of the transfers prior to November of 1971, the inmate was sent from the transferee prison to a criminal mental institution, perhaps because this was recommended by a Rhode Island prison official. The inmate spent three weeks in a solitary cell, the floor of which was covered with excrement. The cell lacked toilet and running water. He received no therapy to speak of. Frequently, no hearings were given the inmates before they had been put in solitary confinement.

The transferred inmates suffered hardships with regard to court proceedings and parole hearings in Rhode Island. No written regulations exist guaranteeing the return of a transferred inmate to Rhode Island for court or parole hearings. In practice, a court order is required to secure the presence of a transferred inmate in Rhode Island. Inmates have been transferred from the A.C.I. just a few days before they were to stand trial; additionally, one inmate was transferred despite requests from the Attorney General's office that he be kept in Rhode Island for trial. At the time of the November 18 transfers, six of the transferred inmates had federal or state charges pending against them and two had appeals pending.

Transfer affects an inmate's parole chances and these effects range from indirect to dramatic. In one instance, the failure of a transferred inmate to appear before the Rhode Island parole board resulted in denial of parole. Other effects, though not so dramatic, are insidiously detrimental.

In preparing their applications for parole, inmates at the A.C.I. have available the services of a classification counsellor. This counsellor helps the inmate make necessary contacts with people on the outside, helps the inmate fill out certain forms for the parole board, and generally acts as a liaison between the inmate and the board. The counsellor helps the inmate with his home and job plans, information of importance to the parole board. The counsellor, and others, also prepare reports on the inmate's attitude for the board.

In the opinion of a classification counsellor at the A.C.I., an out-of-state transfer of an inmate greatly reduces that inmate's probability of success before the parole board. The classification officer has difficulty in making contact with the inmate and his ability to correctly evaluate the inmate diminishes. The inmate, in turn, may have difficulty in preparing his home and job plans and his ties to family and the community have been loosened. Transfer also reduces the chance an inmate has to participate in a rehabilitative program, a factor of some importance to the parole board.

The fact that an inmate has been transferred is put into the report to the parole board. Newspaper clippings as to the "conspiracy" and transfer were in the parole files of some of the transferred inmates. In the situation of Frederick Taylor, his parole report noted that he was transferred "for protective measures." In at least one case, the fact that a transferred inmate was placed in segregation on arrival at the new institution caused concern to the parole board, which asked the Warden for further information.

The parole board has at times sought information on the transferred inmates from the receiving institution. Information from the transferee institution is given the same weight as information from the A.C.I., although no attempt is made to independently verify the conclusions of these reports or to investigate the characters of those who prepare the reports. Frequently these reports arrive late. Members of the parole board have asked inmates why they were transferred.

Inmates at the A.C.I. who are eligible for parole are usually present at initial and at review parole hearings. This is not so for transferred inmates. Frederick Taylor's parole hearing, which came up while he was at Leavenworth, would have proceeded *in absentia* had not Taylor requested a postponement. Usually inmates answer questions at these hearings and it is extremely likely that the lack of presence of the inmate would be detrimental to him. Taylor's classification officer said that while he felt Taylor was a good candidate for parole, he was hampered in his efforts by the fact that Taylor was in Kansas.

Of the eleven inmates who were transferred, four were initially eligible for parole. Three were denied parole and one had not, at the time the record closed, had a hearing. While the parole board gives reasons for denial of parole, in none of these cases did they cite as the reason the out-of-state transfer. The reasons given are usually vague, such as "profit by serving more time."

There is another detrimental effect on the inmate seeking parole. Several of the halfway houses or institutions to which inmates may be paroled require a personal interview of the inmate. Clearly, the inmates are not readily available and the limited resources of such places do not permit them to travel far to conduct such interviews.

Through testimony of an expert witness, Joseph G. Cannon,[4] the plaintiffs have argued that out-of-state transfer *per se* has a detrimental effect on the rehabilitation of an inmate. In summary, it is Mr. Cannon's opinion that transfer of an inmate away from his community is destructive of the positive reinforcement an inmate receives from family and friends. It puts the inmate into a disorienting new environment, a situation criminal offenders particularly have trouble adjusting to. The inmate culture and staff personalities at the receiving institution may be very different from those at the A.C.I., depending on the different geographic and socio-economic region of the receiving institution. Unless the inmate understands the transfer as part of a positive plan to rehabilitate him, the inmate is likely to perceive the transfer as a rejection of him. This is particularly true of a transfer from a lesser to a greater security situation, which has overtones of a disciplinary action. Because of these effects, Mr. Cannon advocates careful classification procedures before transfer and involvement of the inmate in the decision to transfer. The inmate should, Mr. Cannon thinks, be given notice of the proposed transfer and an opportunity to respond.

Normally the inmate's family and attorney are not notified of his transfer until the inmate is well on his way to the new institution. The Warden articulated his reasons for not giving an inmate prior notice or hearing before transfer. Inmates are usually transported to their new institutions by automobile and prior notice of where the inmate is being sent might increase the security risks accompanying the journey. Completely aside from the questions of when and where he will be transferred, the inmate is usually given no notice that he will be transferred. The Warden stated that the reasons no notice of the decision to transfer is given the inmate is that traditionally it has not been done and that it would make operation

4. Mr. Cannon is presently Deputy Commissioner of the Department of Corrections of Minnesota and Chairman of the Minnesota Parole Board. He is in charge of three adult correctional institutions in Minnesota. Prior experience includes holding the offices of Director of Social Services and, later, Assistant Chief of the Ohio Division of Corrections; being the Commissioner of Corrections for the state of Kentucky from 1963–1966; being the Commissioner of Corrections for the state of Maryland from 1967 to 1971. He has been an Assistant Task Force Director for community based correctional programs of the federal Joint Commission on Manpower and Training. He is a member and has held office in several professional societies.

of the prison more complex. If a large number of people are to be transferred, notice of the decision to transfer might lead to disruption in the prison. There is no formal reviewing structure at the A.C.I. to determine whether a transferred inmate should be returned.

Plaintiffs have attempted to show that involuntary transfers are unnecessary, that the state of Rhode Island has adequate alternate facilities to confine suspected troublemakers. The Warden and his staff vigorously dispute this.

After the transfers, the prison officials conducted a search of the A.C.I. and made a display of the resulting "contraband." The purpose of the display was to preserve evidence to support the credibility of the decision to transfer. In this Court's opinion, the display offers precious little support to defendants. The bomb materials found in Vincent Hill's cell were discovered a month before the November 18 transfers and were never linked in any way with those transfers. The long rope which was labeled as having been found in De-Freitas' cell was not the rope taken from DeFreitas' cell. From the testimony of correctional officers and DeFreitas, it appears the rope taken was a small jump rope assigned to DeFreitas by Costa. The rest of the items taken during that search, e. g., food, a rock, a battery, scissors may well have been of entirely innocent use. Finally, as Warden Howard said to Leo Carroll, there was, in general, nothing taken which would not have turned up in any search at any time.

*Rulings*

■ Out-of-state transfer of Rhode Island prisoners does not in and of itself violate the Eighth Amendment's prohibition on cruel and unusual punishment. While it may historically be true that the writ of habeas corpus was intended to prevent the evils of "transportation" of prisoners, these evils have been much diminished by the relative ease of long distance travel and communication today.

Confinement of federal prisoners in institutions far from home is not unusual. The discretion vested in the Attorney General of the United States to confine federal prisoners in any suitable and appropriate place was upheld by the First Circuit Court of Appeals against an Eighth Amendment challenge in Rodriguez-Sandoval v. United States, 409 F. 2d 529 (1st Cir. 1969). It is difficult to see any argument that state prisoners are entitled to greater protection under the Eighth Amendment than are federal prisoners.

Nor do I find transfers to be cruel in the constitutional sense. Transfer is not, per se, excessive, serving no legitimate end. See Furman v. Georgia, 408 U.S. 238, 330–333, 92 S.Ct. 2726, 33 L. Ed.2d 346 (J. Marshall). However, it may be that the conditions under which transferred inmates are confined do themselves violate the Eighth Amendment and that the transferor officials may be held responsible for these conditions. The confinement of Douglas Gomes in a tiny excrement-covered cell at a Massachusetts mental institution, for instance, may well have been in violation of the Eighth Amendment. See Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), 460 F.2d 126 (1972). However, this particular issue is not before the Court.

Although out of state transfers are not themselves constitutionally forbidden, the procedures and practices under which the transfers have been effectuated violate the constitutional guarantee of due process. Questions of equal protection are also involved.

There appear to be three reasons for the involuntary transfer of inmates from the A.C.I.: discipline, prison security, and rehabilitation. As practiced at the A.C.I., all involuntary transfers, whatever the reason given, have had a punitive element. All involve loss of liberty and of property sufficient to warrant that there be some procedural safeguards followed in imposing such deprivations.

■ The nonconsensual transfers made other than on November 18, 1971, have been largely for disciplinary reasons. When an inmate is transferred from the A.C.I., disciplinary charges against him are dropped. Inmates who are transferred for disciplinary violations do not receive the due process protections afforded inmates who are put in segregation at the A.C.I. for disciplinary violations. Under rules promulgated by consent in the case of Morris v. Travisono, see 310 F.Supp. 857, (D.R.I.1970) (interim decree), inmates at the A.C.I. who are charged with disciplinary violations are entitled to timely written notice of the charge, investigation and review of the charge by a superior officer, a hearing before the disciplinary board, administrative review of the board's decision, and a record of the proceedings. At the hearing, the inmate is read the charge and given the opportunity to respond. If he denies the charge he may present his side of the story, including calling and examining witnesses. He may have the assistance of a lay advocate. The disciplinary board must be impartial and must render its decision on the basis of substantial evidence. See Regulations Governing Disciplinary Procedures for All Inmates at the Adult Correctional Institution, State of Rhode Island, promulgated under the Rhode Island Administrative Procedure Act, R.I. G.L. § 42–35–2. Equal protection requires application of these Morris rules procedures to inmates whose transfers have been triggered by a disciplinary violation. The Fourteenth Amendment also requires that the inmate be notified that the disciplinary board may elect to transfer him.

■ Whatever the reason for the transfer, the deprivations suffered by the transferred inmates require the imposition of due process protections. In no case is there evidence that transfer enhanced the inmate's prospects of participation in a rehabilitative program. Rather, the opposite is true. Involuntary out of state transfer in and of itself has detrimental effects on the transferred inmate. The detriment to the inmate is, on the basis of the evidence before the Court, only exacerbated by what greets him at the receiving institution, as has been amply discussed earlier in this opinion. The evidence shows that transfer radically transforms an inmate's life. As to the men transferred on November 18, they were branded as troublemakers who conspired to disrupt the prison, and they were not given any opportunity to defend themselves. Transfer seriously burdens an inmate's access to counsel and the courts and impairs his parole chances.

While *Rodriguez-Sandoval, supra,* holds transfers do not violate the Eighth Amendment, it did not answer the question of whether transfer entails sufficient deprivations to warrant procedural due process protections. The nature of some of the deprivations involved in long distance transfers was recognized in 1916 by Judge Morton of the United States District Court for Massachusetts. In ordering the return of an inmate who had been transferred from Charlestown, Massachusetts to Leavenworth, Kansas, in Keliher v. Mitchell, 250 F. 904 (D. Mass.1916), Judge Morton noted:

> While prisoners have no right to receive visits from their family, they are at present universally allowed to do so at certain intervals, both for their own good and for the sake of their family. The transfer of a prisoner, having a wife and young child, from a prison near which they reside, and at which they can visit him, to a distant place of confinement where they may well be unable to go, with the result that they may not see him for 10 or 12 years, obviously imposes on him an additional hardship . . . and additional peril. It may result in the loss of that interest in him by his family and friends which would be maintained if they saw him occasionally, and which furnishes one of his most powerful incentives to reformation and honest living after his discharge."

250 F. at 906–907 [citations omitted]

The cases which find no constitutional rights infringed in intrastate transfers are inapposite here, where distances of up to almost 1500 miles and different jurisdictions are involved. See United States ex rel. Stuart v. Yeager, 293 F. Supp. 1079 (D.N.J.1968); Lewis v. Gladden, 230 F.Supp. 786 (D.Or.1964); Bell v. Warden of Maryland House of Correction, 207 Md. 618, 113 A.2d 482 (1955). See also Hanvey v. Pinto, 441 F.2d 1154 (3rd Cir. 1971). Of more concern are the cases holding that no constitutional claim is raised by transfer of a state prisoner to a distant federal prison, see Hillen v. Director of Department of Social Service and Housing, 455 F.2d 510 (9th Cir. 1972) cert. den. 409 U.S. 989, 93 S.Ct. 331, 34 L.Ed.2d 256; Duncan v. Madigan, 278 F.2d 695 (9th Cir. 1960) cert. den. 366 U.S. 919, 81 S. Ct. 1096, 6 L.Ed.2d 242; Duncan v. Ulmer, 159 Me. 266, 191 A.2d 617 (1963). With due respect, this Court does not choose to follow these cases. *Hillen* was a pro se action by an inmate challenging his transfer from Hawaii to California. The district court dismissed the action for failure to exhaust state remedies. The Ninth Circuit Court of Appeals held the exhaustion doctrine inapplicable but held that transfers pursuant to the Western Interstate Correction Compact, 20 Haw.Rev.Stat. § 355–1, present no constitutional issues. A reading of the briefs indicates that there was some dispute over whether the transfer was consensual or not. In any event, no evidentiary hearing was ever held in *Hillen*, nor were the constitutional issues adequately presented or briefed. Duncan v. Madigan found that an inmate had no right to be heard with respect to his place of custody and that the transfer did not deny him equal protection. It did not reach the precise constitutional claims involved here. In light of current perceptions of the requirements of due process, Duncan v. Ulmer cannot be controlling. A recent case from the District of Oregon, Capitan v. Cupp, Civ. No. 72–738 (D.Or. Dec. 6, 1972) has held

that procedural due process protections apply to interstate transfer of prisoners.

Where substantial individual interests are at stake, some assurances of elemental fairness are required. Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Gray v. Creamer, 465 F.2d 179 (3rd Cir. 1972); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971); United States ex rel. Robinson v. Mancusi, 340 F.Supp. 662, 663 (W.D.N.Y.1972). Whether the decision to transfer is based on a disciplinary violation, security requirements, or the rehabilitative interests of the particular inmate, the decision is based upon some perceived facts about the inmate and his behaviour. The consequences of an erroneous preliminary determination of these facts is an infringement of liberty and imposition of hardship on innocent persons. This is well illustrated by the transfers of Sweet and Ouimette "by mistake." See The Growth of Procedural Due Process, 66 Nw.L.Rev. 502 (1971). The determination of whether due process requirements apply depends upon a determination of the nature of the interests being infringed, not upon a weighing of the competing interests of the parties, Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, whatever the state's interests, procedural due process requirements must be met in interstate transfers because of the heavy burdens such transfers impose on the inmates.

The minimal requirements for insuring the integrity of the decision making process are that the inmate be given notice of the charges against him or reasons for the transfer, an opportunity to respond to those charges or reasons, and if he denies the charges or disputes the reasons, an opportunity to present evidence in support of his position. William v. Robinson, 139 U.S. App.D.C. 204, 432 F.2d 637 (1970). Were the burdens imposed on a trans-

ferred inmate not so great, these requirements might constitute all the process that is due. But because transfer, through diminution of parole and rehabilitative program possibilities, may well lead to a longer period of incarceration of the inmate than would otherwise be the case, more rigorous requirements are in order. The inmate should be given prior written notice of the charge, should have the right to the assistance of a lay advocate, should have the right to a determination by an impartial board on the basis of substantial evidence, and should have a record of the proceedings and findings of the board. See Meyers v. Alldredge, 348 F.Supp. 807, 822–824 (M.D.Pa.1972).[5]

■ In the determination of what forms of process are due, it is appropriate to weigh the interests of the parties. *Roth, supra,* at 570, 92 S.Ct. 2701, 33 L. Ed.2d 548. The Warden's fears that security risks for the journey of the inmate to the new institution would be enhanced by prior notice of the transfer go to notice of the time of transfer and the exact destination. No such risks are involved in a notice of the possibility of transfers. The Warden's fears that notice of a large number of transfers might lead to disruption in the prison do not apply to the normal one or two man transfers. A large number of transfers at once is foreseeable only in emergency situations, when special rules would apply. See Roberts v. Pepersack, 256 F. Supp. 415, 432 (D.Md.1966). As to the argument that the notice and hearing procedure outlined above would be an undue administrative burden, this is neither the fact nor would it, if true, be of significant weight. Substantially simi-

lar procedures are already followed at the A.C.I. under the *Morris* rules with regard to disciplinary and classification procedures, and this Court cannot see how extending such procedures to transfers, which often substitute for disciplinary or classification proceedings, could be burdensome. See also Duncan v. Ulmer, *supra,* 191 A.2d at 624.

■ While it appears that the state has, absent special circumstances, no interest in the summary transfer of inmates to prisons outside of Rhode Island, it does appear that the state has an interest in affording due process protections. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The state has an interest in rehabilitating its prisoners so that, among other reasons, its citizens are spared the costs of further crime from these individuals. Certainly, the resentment felt by inmates who feel they have been transferred unjustly or without reason interferes with their rehabilitation. Involving the inmate in the decision to transfer will not decrease the discretion of prison officials, but will minimize the inmate's sense of resentment and will produce more appropriate, individualized results. In view of the detrimental effects transfer frequently has on an inmate's rehabilitative program, the state has an interest in assuring that the decision to transfer is correct. Finally, the state has an interest in determining that transfers are not made as punishment for the valid exercise of the constitutional rights or statutory rights [6] of that class of its citizens who are incarcerated.

■ These procedural safeguards must be afforded the inmates *before*

---

5. Because the issue was not raised by the parties, this Court makes no ruling on what additional protections must be afforded where the charges which lead to transfer are also charges of violations of the criminal laws. See, e. g. Clutchette v. Procunier, *supra.*

6. Under R.I.G.L. § 13–11–2, Art. V a transferred prisoner may be held for crimes committed in the receiving state.

Transfer thus may act to circumvent the inmate's right to contest a demand for extradition, see Brown v. Sharkey, 263 A.2d 104, 107, 106 R.I. 714 (1970). A hearing prior to transfer, then, becomes necessary to determine whether the reason for the transfer is the desire of the receiving state to press criminal charges against the inmate. See State ex rel. Garner v. Gray, 55 Wis.2d 574, 201 N.W. 2d 163 (Oct. 5, 1972).

transfer except in those extraordinary situations where a valid governmental interest is at stake which justifies postponing the hearing until after the event. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1970). This brings us to defendants' justifications for the November 18, 1971 transfers.

■ It is clear that eight of the November 18 transfers were motivated by the stories of a plotted uprising and, consequently, by a concern for the security of the A.C.I., and that these transfers were not motivated by a concern for the rehabilitation of the transferred inmates. Evidence to the contrary I find to be not credible.[7] These inmates suffered loss of liberty and of property without being given an opportunity to respond to the suspicions raised against them. However, it is not the role of this Court to determine whether there was in fact a conspiracy to disrupt the prison. It suffices that the belief of prison officials that there was such a plot, while not firmly rooted in reliable evidence, was not arbitrary or capricious. See Hirabayashi v. United States, 320 U.S. 81, 102, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Nor is this Court in a position to say that there were adequate facilities in Rhode Island to isolate the inmates pending a hearing before transfer. However, even given an emergency around November 18, 1971, there was no reason for not bringing the inmates back to Rhode Island for a hearing after the emergency had subsided. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123,

162, 71 S.Ct. 624, 95 L.Ed. 817 (1950) (J. Frankfurter). Thus, where strong emergency conditions mitigate against notice and hearing before transfer, the inmates must be brought back to Rhode Island where accusers and witnesses are for the full hearing procedure outlined above when the emergency conditions have passed. Bowers v. Smith, 353 F. Supp. 1339 (D.Vt.1972). Further, transfers must be periodically reviewed by A.C.I. officials.

■ The procedural due process protections thus far afforded the plaintiffs do not suffice to remedy the constitutional deprivations accompanying transfers. Transfers have a detrimental effect on the inmate's chances of being released on parole. In order to minimize these detriments, defendants are required to promulgate written regulations providing for the return of transferred inmates to the A.C.I. for their parole hearings. The presence of the inmate at his parole hearing is important to his chances of release, and the transferred inmate should not be deprived of the opportunity to appear and speak for himself.

■ The Constitution protects an inmate's right of access to the courts and his corollary right to obtain legal assistance. Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). A custodian may not impair the access to the courts of one committed to his custody, whatever the nature of the legal proceedings involved. Cross v. Powers, 328 F.Supp. 899 (D.Wis.1971). The evidence shows that transfers have impaired the inmates' access to courts and counsel in

7. It is clear that defendants have a very broad and self-serving concept of the meaning of "rehabilitation." It is one this Court cannot accept. Among other things, the decisions to transfer eleven men were made in a few hours. The men were transferred helter-skelter to whatever prison would accept them. No investigation was made of the rehabilitative, psychiatric, or educational programs available at possible recipient institutions. No attempt was made to put transferred inmates into institutions with inmates of

appropriate age groups. Some of the transferred inmates had no recorded disciplinary offenses for several years prior to the transfer. Two inmates were transferred by mistake.

The theory that transfer provides inmates with fresh starts and consequently must be rehabilitative, is offset by both the testimony of Mr. Cannon and the failure of A.C.I. officials to use any discrimination in selecting a receiving institution.

several ways. Face to face communication between the inmate and his retained counsel is virtually eliminated. There is increased reliance on communication by letter. Letters, however, are subject to mail censorship regulations which have been more stringent than those employed at the A.C.I. In at least one instance, a transferee's letter to his attorney was returned to him because officials at the receiving institution objected to its contents. This is unconstitutional. Nolan v. Scafati, *supra*; Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972).

The plaintiffs argue that the rights held by Rhode Island inmates under the disciplinary and mail censorship regulations at the A.C.I. must follow that inmate wherever he is transferred. However, there has been in this District no final adjudication on the merits of constitutional claims raised in the context of mail censorship and disciplinary actions at the A.C.I. See Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970) (temporary restraining order); Morris v. Travisono, 310 F.Supp. 857 (D.R.I. 1970) (interim decree), and final consent decree entered April 20, 1972. Because the case at bar did not raise directly the issue of whether these A.C.I. rules are constitutionally compelled, this Court is in no position to make a ruling on whether the Constitution requires that transferred inmates retain the rights they had under the A.C.I. rules.

■ Aside from the issue of constitutional compulsion, the New England Corrections Compact itself provides as to transfers to state prisons:

> "The fact of confinement in a receiving state *shall not deprive any inmate so confined of any legal rights* which said inmate would have had if confined in an appropriate institution of the sending state." (emphasis added)
>
> R.I.G.L. § 13–11–2, Art. IV(e)

Because the *Morris* rules have been promulgated under the state Administrative Procedure Act, see R.I.G.L. § 42–35–1, and because the *Morris* rules are part of a consent decree entered by this Court,

see Brunswick Corp. v. Chrysler Corp., 408 F.2d 335, 337 (7th Cir. 1969), those rules have legal status and create "legal rights" within the meaning of the New England Compact. Plaintiffs are entitled to declaratory relief to this effect. However, this Court lacks jurisdiction over the receiving institutions whose obligation it is to make provision for the rights of the transferred inmates. If these rights protected by the New England Compact are being denied, relief must be sought in courts of appropriate jurisdiction.

The inopportune timing of some of the transfers resulted in postponement of trials of two of the inmates and denial of a preliminary examination to a third inmate charged with a federal offense. Because defendants have been unwilling to return transferred inmates for consultation with counsel or to appear in court proceedings absent a court order, counsel have been put to extra burden and clients to extra expense in merely securing the presence of the inmate in Rhode Island. Defendants shall promulgate regulations providing for the return of transferred inmates to Rhode Island to appear in legal proceedings and, where counsel affies to its necessity, to consult with counsel a reasonable time before such proceedings. The requirement of notice and hearing prior to transfer should act to reduce the number of transfers just before trial.

■ Under the pendent jurisdiction of the Court, plaintiffs argue that transfers as practiced by defendants are illegal under state and federal statutory law. The authority to transfer inmates from the A.C.I. to federal penitentiaries is given by R.I.G.L. § 13–12–1:

> "13–12–1. Authority to transfer prisoners.—The attorney general, when the director of social welfare or the assistant director of correctional services shall *certify that proper and adequate treatment, facilities and personnel are unavailable* within this state, shall hereby authorize to contract with the proper officials (director of bu-

reau of the prisons) of the United States for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of this state." (emphasis added)

[The statute now grants authorization to the Director of the Department of Corrections and the Attorney General]

and 18 U.S.C. § 5003

"5003. Custody of State offenders (a) The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory: Provided, That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved."

The New England Interstate Corrections Compact, at R.I.G.L. § 13–11–2 provides:

"ARTICLE IV

Procedures and Rights

(a) Whenever the duly constituted authorities in a state party to this compact, and which has entered into a contract pursuant to article III, *shall decide that confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary or desirable in order to provide adequate quarters and care or any appropriate program of rehabilitation or treatment,* said officials may direct that the confinement be within an institution within the territory of said other party state, the receiving state to act in that regard solely as agent for the sending state." (emphasis added)

Plaintiffs argue that each transfer must, by statute, be found to be in the rehabilitative interests of the inmate involved. "Rehabilitation" and "treatment" are words susceptible of many interpretations and this Court lacks the guidance of a precise definition by the state courts.

The statutory language requires that transfers from the A.C.I. to federal prisons be premised on a certification that "proper and adequate treatment, facilities and personnel are unavailable." The language of the New England Compact requires that the transfer be "necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment." What is proper, adequate, or appropriate treatment of an inmate and what is adequate care are not *entirely* unrelated to the security requirements of the A.C.I. or disciplinary sanctions against an inmate. While the emphasis in the statutes does appear to be that transfers be in the rehabilitative interests of the inmate, the statutory language is broad. Plaintiffs' argument that the past transfers are illegal as a matter of statutory law must fail.

Nonetheless, if the statutory intent is to be followed, it would seem that defendants must make a determination that Rhode Island's facilities are inadequate and that there are adequate and appropriate facilities at the receiving institution before transfer (absent an emergency). Under the New England Compact defendants must investigate what programs would be available to the inmate at the receiving institution before transfer. This is not entirely possible for transfers to the federal system, where federal officials decide which institution will receive the inmate. However, in both federal and New England transfers, defendants should provide the receiving institution with a statement of why Rhode Island's facilities are inadequate, and what

would be an appropriate treatment program, and the reasons therefor.

The Warden has indicated that the men transferred November 18, 1971 would have been returned to Rhode Island by now but for fear it would prejudice defendants' position in this action. This Court orders the return of those inmates to Rhode Island within a reasonable time. As to those inmates who have been transferred since November 18, 1971, this Court orders that they be returned to Rhode Island for hearings as outlined infra on the issue of whether they should be returned to Rhode Island. The parties should understand that the rulings contained in this opinion do not prohibit interstate transfer of inmates, but require that such transfers be accomplished under procedures guaranteeing due process of law and subject to regulations which will protect the rights of inmates under the First, Sixth, and Fourteenth Amendments.

## ORDER

In accordance with the findings of fact and conclusions of law set forth in the opinion above, this Court orders, adjudges, and decrees that:

1. Plaintiffs have properly brought this action on their own behalf and pursuant to Rule 23(a) and b(2) of the Federal Rules of Civil Procedure on behalf of all adult male persons presently incarcerated pursuant to criminal conviction by Rhode Island courts in that plaintiffs' class is so numerous as to make joinder of all members impracticable; the policies and procedures challenged by the named plaintiffs have been applied to numerous members of plaintiffs' class and are applicable to all members of plaintiffs' class; and, the claims of the named plaintiffs are typical of and common to all members of the class.

2. Defendants are enjoined from the involuntary transfer of any Rhode Island male prisoner, incarcerated pursuant to a judgment of conviction by Rhode Island courts, to a state or federal prison in another state, unless:

A. Prior to transfer (absent an emergency situation or compelling state interest), the inmate is given written notice of the charge or reasons for transfer; this charge or reason is investigated and reviewed by a superior officer; a hearing on the question of transfer is held before an impartial board; administrative review of the charge is available; and a record of the proceeding is kept. At the hearing the inmate must be read the charge and given the opportunity to respond, which opportunity shall include the right to call and examine witnesses and to have the assistance of a lay advocate. The decision to transfer must be based on substantial evidence.

In the event of an emergency situation resulting in transfer, the inmate must be returned to Rhode Island for the hearing and procedures outline above soon after the emergency has subsided; and

B. Periodic review is made of the status of the transferred inmate and whether he should be returned to Rhode Island. The Court suggests review every three months; and

C. Written regulations are promulgated which guarantee:

a) the return of a transferred inmate to Rhode Island for all hearings before the parole board which will consider the subject of his parole;

b) the return of a transferred inmate to Rhode Island for appearance in all court proceedings in Rhode Island in which he is involved; and

c) the return of a transferred inmate to Rhode Island to confer with counsel in preparation for Rhode Island legal proceedings on affidavit of counsel that the presence of the inmate is necessary; and

D. Prior to transfer (absent an emergency or compelling state interest), an investigation is made of the treatment or rehabilitative programs available in the receiving institution, or, in the case of transfers to a federal prison, of the receiving penal system. Defendants must provide the recipient institution with a statement of why Rhode Island's facilities are inadequate for the transferred inmate and what would be an appropriate treatment program and the reasons therefor.

3. Involuntary transfer of inmates of the plaintiff class to a state or federal prison in another state violates the Sixth and First Amendments and the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution unless the conditions set out in paragraph 2 above are met.

4. The *Morris* rules, as promulgated under the Rhode Island Administrative Procedure Act and entered by this Court as part of a consent decree in Morris v. Travisono, create legal rights in A.C.I. inmates which should be afforded to transferred Rhode Island inmates by state receiving institutions under the terms of the New England Corrections Compact, R.I.G.L. § 13–11–2 Art. IV(e).

5. Defendants shall return to custody in Rhode Island within a reasonable period of time the eleven inmates transferred on November 18, 1971 and shall return to Rhode Island all inmates who have been transferred at other times for hearings on whether these inmates should be returned to custody in Rhode Island.