**Alfred BISHOP, Edward Franco, Petitioners,**

v.

**John J. MORAN, Director of Corrections for the State of Rhode Island, Kenneth R. Walker, Chairperson, Rhode Island Parole Board, Respondents.**

Civ. A. No. 4794 P.

United States District Court, D. Rhode Island.

Dec. 2, 1987.

John Cicilline, Providence, R.I., for petitioners.

David Dugan, Asst. Atty. Gen. of R.I., Providence, R.I., George Cappello, R.I. Dept. of Corrections, Cranston, R.I., for respondents.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This case presents the question of whether the Rhode Island Parole Board comes in conflict with the Fourteenth Amendment's guaranty of equal protection of the laws when it provides that only in-state inmates shall attend discretionary parole eligibility review hearings.

## INTRODUCTION

Like similar agencies in other states, the Rhode Island Corrections Department is authorized by statute to transfer inmates to state and federal facilities located in other states. Some transfers are requested by the inmates. Others are ordered by the Department in response to security risks, overcrowding, or simply as a result of a determination that the rehabilitative needs of a particular inmate would be better met by another facility.

Alfred Bishop was convicted of murder in 1974. He was sentenced to life imprisonment. After spending four years in a Rhode Island facility, Mr. Bishop was transferred to the custody of the federal prison system and is currently housed in Lewisburg, Pennsylvania. Under Rhode Island law, Mr. Bishop became eligible for parole ten years after conviction. After a hearing held on November 1, 1984, at which Mr. Bishop was present, the Rhode Island Parole Board denied parole.

On December 2, 1986, Mr. Bishop, through his attorney, requested that he be transported to Rhode Island for the purpose of making a personal appearance before the Parole Board. That request was denied by Kenneth Walker, Chairman of the Parole Board. Mr. Bishop's attorney then requested, and Mr. Walker provided, a cost estimate of transporting Mr. Bishop from Lewisburg to Rhode Island. Apparently, Mr. Walker had determined that if Mr. Bishop could pay the costs, estimated at approximately fifteen hundred dollars, he could attend the hearing.

Mr. Bishop's attorney then informed Mr. Walker that Mr. Bishop could not possibly pay the estimated amount and requested that the Department of Corrections "waive those fees," that is, pay for transporting Mr. Bishop. Mr. Walker denied the request, stating, without elaboration, "I cannot in all fairness to the Department of Corrections ask them to waive a policy that has been in effect since before I became a member of the Parole Board."

Mr. Bishop then filed the instant action on April 9, 1987. He alleges that a decision rendered by this court in 1973, *Gomes v. Travisono*, 353 F.Supp. 457 (D.R.I.1973), provides that all inmates transferred out of state must be returned for all parole hearings and that Mr. Walker, by refusing to have him brought before the Parole Board, is in contempt of that order. He further argues that because in-state prisoners are routinely brought before the Board for identical review hearings he is being denied the equal protection of the laws as guaranteed by the fourteenth amendment of the United States Constitution.

Mr. Bishop's action was joined on June 5, 1987 by Edward Franco. Mr. Franco was convicted of assault with a deadly weapon and sentenced to a term of seven years imprisonment. Mr. Franco was transfer-

red to the custody of the federal prison system in 1985 and is currently housed in Lewisburg, Pennsylvania, along with Mr. Bishop. A hearing was held by the Parole Board regarding Mr. Franco's parole eligibility on March 5, 1987. Mr. Franco was not present. He now argues that the March 5 hearing violated the *Gomes* order and also denied him the equal protection of the laws.

On October 22, 1987 this Court conducted a hearing to resolve some of the factual discrepencies presented in the parties' pleadings. Kenneth C. Pederzani, Executive Secretary of the Parole Board, testified regarding the policy of the Parole Board in reviewing the parole status of out-of-state inmates. Mr. Pederzani testified that there are two types of parole hearings. The first type, the "initial eligibility hearing," is held once the inmate first becomes eligible for parole.[1] Both in-state and out-of-state inmates attend these hearings. After this initial hearing, the Board's policy is to review an inmate's eligibility every six months to a year.[2] These are considered "discretionary hearings." It is the Board's policy that while in-state inmates are brought before it for these proceedings, hearings concerning out-of-state inmates are conducted in absentia.

Mr. Pederzani testified that in-state inmates are permitted to make presentations on their behalf at these discretionary hearings. The Board is provided an opportunity to question the inmate, and at the end of the hearing the inmate is permitted to ask questions or to make a statement; "he has a chance," as Mr. Pederzani put it, "to express himself in any way."

The eligibility of out-of-state inmates is determined largely from reports submitted by the institution in which the inmate is housed. Inmates can, however, have letters submitted on their behalf to the Board

---

**1.** The inmate's initial eligibility is determined by statute. An inmate who was not sentenced to life imprisonment becomes eligible for parole after serving one-third of his term. R.I.G.L. § 13–3–9 (Miche 1981). Inmates like Mr. Bishop who have been given life sentences are initially eligible ten years after conviction. *Id.* at § 13–8–13 (Supp.1986).

**2.** Mr. Pederzani testified that the discrepancy in the review periods is motivated by the Board's belief that unlikely candidates should be reviewed less often to avoid discouragement caused by frequent denials.

and have representatives, such as clergy and lawyers, appear before the Board.

## DISCUSSION

Plaintiffs' argument that the Department of Corrections' refusal to return them for parole hearings is in conflict with this court's order in *Gomes v. Travisono*, 353 F.Supp. 457 (D.R.I.1973), compels this court to revisit that case. In *Gomes*, this court held that transferring inmates out of the state of Rhode Island entailed serious deprivations to the inmate which "require the imposition of due process protections." *Id.* at 466. Accordingly, the Rhode Island Department of Corrections was enjoined from transferring inmates out of state unless it followed certain procedures, including hearings and subsequent periodic evaluations of the transferee's status. *Id.* at 472. Among these procedures, the Department was to adopt written regulations which guaranteed, among other things, "the return of a transferred inmate to Rhode Island for all hearings before the Parole Board which will consider the subject of his parole." *Id.* at 472. As this court stated:

> Transfers have a detrimental effect on the inmate's chances of being released on parole. In order to minimize these detriments, defendants are required to promulgate written regulations providing for the return of transferred inmates to the A.C.I. for their parole hearings. The presence of the inmate at his parole hearing is important to his chances of release, and the transferred inmate should not be deprived of the opportunity to appear and speak for himself.

*Id.* at 469.

The First Circuit Court of Appeals reversed in part and affirmed in part the decision in *Gomes.* While concluding that "*some* due process is mandated in all transfer cases," it felt "constrained to paint with a smaller brush" in determining which procedures were actually required. *Gomes v. Travisono*, 490 F.2d 1209, 1214 (1st Cir. 1973). Although it rejected some of the procedures required by this court, the first circuit specifically stated that it did not "take issue with the requirements of . . .

regulations governing the return of transferred inmates to parole board hearings." *Id.* at 1216.

The case then went up to the Supreme Court, which vacated, without opinion, the circuit court's order and remanded for reconsideration in light of its recent pronouncements of the requirements of due process in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Travisono v. Gomes*, 418 U.S. 909, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974). After reconsidering the case, the first circuit modified some of its earlier requirements but did not express any views on the subject of returning transferees for parole. It nonetheless stated that "our holding in *Gomes* is affirmed as modified." 510 F.2d 537, 542 (1st Cir.1974).

Were the *Gomes* cases the only evidence that this court could examine, it would appear that that part of the district court order requiring the return of inmates for parole hearings remains intact. This court is convinced, however, that subsequent cases by the Supreme Court and the first circuit calls into question its continued vitality.

*Gomes* was one of the first cases to consider the constitutional implications of interstate transfers. Its holding was premised upon the belief that "the deprivations suffered by the transferred inmates require the imposition of due process protections." 353 F.Supp. at 466. That belief, in turn, was founded upon the then-prevailing conception of due process which focused on whether the transfer process constituted "grievous loss" to the inmate. 490 F.2d at 1212.

In two cases decided several years after *Gomes, Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court expressly rejected the "grievous loss" approach to questions of procedural due process in prison transfers. The Court held that unless the inmate can point to some right or justifiable expectation rooted in state law, "no Due Process Clause liberty interest of a duly convicted

inmate is infringed when he is transferred from one prison to another within the state, whether with or without a hearing." *Montanye*, 427 U.S. at 242, 96 S.Ct. at 2547.

Although the Court in those cases concerned itself with intrastate transfers, the first circuit subsequently held that the teachings of *Montanye* and *Meachum* apply to interstate transfers as well. *Sisbarro v. Warden, Mass. State Penitentiary*, 592 F.2d 1, 3 (1st Cir.1979). As the court stated:

> [W]e can see no reasoned basis on which to revert to the *Gomes* analysis ... when the prisoner has been transferred interstate to another state or federal institution, even though *Gomes* involved such a transfer. It may often be true that a prisoner will be moved a longer distance when he is transferred interstate rather than intrastate, resulting in substantial interference with communication and visitation, and that his access to legal materials and lawyers of the state in which he was convicted may be diminished. Greater disadvantages thus may accompany an interstate transfer. But the Court has held that an increase in burdensome conditions does not in itself implicate the due process clause; "the determining factor is the nature of the interest involved rather than its weight."

Id. (quoting *Meachum*, 427 U.S. at 224–25, 96 S.Ct. at 2538).

This court therefore cannot dispose of the issue before it simply by inserting a citation to *Gomes*. That case, notwithstanding its assault in the appellate process, appears to have been cut off at the knees by *Sisbarro* and *Meachum*. In fact, for all this court can see, *Sisbarro* overruled *Gomes* and its progeny sub silentio. If transferred inmates do possess a right to be returned for parole hearings, it must be rooted in something far more enduring.[3]

*Equal Protection*

As a state agency, the Parole Board's policies and decisions are subject to the commands of the Equal Protection Clause of the Fourteenth Amendment. *Avery v. Midland County, Texas*, 390 U.S. 474, 475–481, 88 S.Ct. 1114, 1115–1118, 20 L.Ed.2d 45 (1968). The Board cannot act arbitrarily and inconsistently, treating similar inmates differently for apparently no reason. *Melvin v. Petrovsky*, 720 F.2d 9, 12 (8th Cir. 1983). It has a constitutional obligation to ensure that all inmates who are similarly situated be similarly treated. *Hluchan v. Fauver*, 480 F.Supp. 103, 109 (D.N.J.1979).

The plaintiffs do not suggest to this court that the right to attend all discretionary review proceedings is independently founded on the right to due process. Rather, they contend that because in-state inmates are routinely brought before the Board for a hearing at these proceedings as a matter of policy, denying them similar treatment denies them the equal protection of the laws.

■ It is, of course, not required under equal protection doctrine that the claimed right be otherwise guaranteed by the constitution. *French v. Heyne*, 547 F.2d 994, 997 (7th Cir.1976). It may well be that due process does not require an inmate to be present at these discretionary proceedings. That question is not before this court.[4] But that is not to say that a state that chooses to provide for hearings may do so free of the strictures of equal protection. *See Griffin v. Illinois*, 351 U.S. 12, 18, 76

---

3. Other courts have suggested that *Gomes* is no longer controlling authority. In *Corgain v. Miller*, 708 F.2d 1241 (7th Cir.1983), an inmate contesting his transfer urged *Gomes* on the court. The court stated:

> *Gomes* ... was decided without the benefit of the Supreme Court's *Meachum v. Fano* analysis, which substantially undermines the *Gomes* underpinnings. The circuit in which *Gomes* originated recognized this and has retreated from *Gomes*, stating that in light of *Meachum*, the *Gomes* analysis would no longer be applied to interstate transfers.

Id. at 1253 (citing *Sisbarro*, 592 F.2d at 3).

4. In *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court held that full adversarial hearings were not required for discretionary review proceedings. But because the Nebraska Parole Board permitted all inmates to attend these review proceedings, the Court did not reach the issue of whether attendance was in fact constitutionally required. *See id.* at 16 n. 8, 99 S.Ct. at 2108 n. 8.

S.Ct. 585, 590, 100 L.Ed. 891 (1956). Even a gratuitous benefit, if provided by the state, must be provided equally. *Zobel v. Williams,* 457 U.S. 55, 60, 102 S.Ct. 2309, 2312–13, 72 L.Ed.2d 672 (1983).

Of course, not every distinction drawn by the state or in this case the Parole Board is automatically invalid under the Equal Protection Clause. The distinction is permissible if it "rest[s] upon some ground of difference having a fair and substantial relation" to the permissible objectives of the state. *Jamieson v. Robinson,* 641 F.2d 138, 142 (3d Cir.1981). Put another way, the difference in treatment must "rationally further a legitimate state purpose." *Zobel,* 457 U.S. at 60, 102 S.Ct. at 2313. Rationality, in turn, "must be measured by the ability vel non of the classification to serve the purpose intended by the ... rule." *Oaks v. District Court of the State of Rhode Island,* 631 F.Supp. 538, 545 (D.R.I.1986).

Before turning to the Parole Board's justifications for the different treatment, a few preliminary matters must be addressed. First, the equal treatment guaranteed by the Equal Protection Clause is a comparative right; that is, one's entitlement to something he does not have depends in large measure upon whether he stands in a position similar to one who already receives it. *See generally* Simons, *Equality as a Comparative Right,* 65 B.U. L.Rev. 387 (1985). The constitution "does not require things which are different in fact to be treated as though they were the same." *Rinaldi v. Yeager,* 384 U.S. 305, 309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966). It "requires only that persons *similarly situated* receive like treatment at the hands of the sovereign." *R.I. Ch. of Nat. W. Pol. C. v. R.I. Lottery,* 609 F.Supp. 1403, 1417 (D.R.I.1985).

Inmates like Alfred Bishop and Edward Franco are transferred to prisons in other states pursuant to interstate prison transfer compacts. *See, e.g.,* R.I.G.L. § 13–11–2 (Miche 1982) ("New England Interstate Corrections Compact" providing for transfers of inmates to states in New England); *id.* at § 13–12–1 (providing for transfers of inmates to federal prisons). The Compacts are designed to permit Rhode Island to transfer inmates to alleviate over-crowding and security risks, to effectuate discipline, and to otherwise intelligently utilize the resources of other penal systems to respond to the myriad and diverse needs of rehabilitation and confinement. *Sisbarro,* 592 F.2d at 3–4; *Rebideau v. Stoneman,* 398 F.Supp. 805, 811 (D.Vt.1975). But the mere fact that an inmate is being housed in a different facility does not mean that he is no longer a Rhode Island state prisoner subject to the jurisdiction of the Rhode Island Department of Corrections along with in-state prisoners. *See U.S. v. Franzen,* 669 F.2d 433, 435 & n. 2 (7th Cir.1982); *Battista v. Kenton,* 312 F.2d 167, 168 (2d Cir.1963). Indeed, the fact that both in-state and out-of-state inmates are reviewed for parole by the Rhode Island Parole Board vividly illustrates that both are similarly situated for purposes of equal protection.

Another preliminary matter involves determining whether out-of-state inmates are actually being denied anything. The state apparently believes that they are not. It suggests that the only thing the state is providing is an opportunity for periodic review of parole eligibility. This, it argues, is being provided equally to both in-state and out-of-state inmates, albeit in different forms. The state therefore concludes that the out-of-state inmates are receiving *like treatment* consistent with equal protection because their eligibility is reviewed in a manner that is equivalent to proceedings involving a personal appearance.

Only willful blindness could overlook the difference that a personal appearance could make in a parole review determination. In fact, this court is not forced to imagine the effect a personal appearance could have; Mr. Pederzani, the Executive Secretary of the Parole Board, testified quite ably on that score. After describing the numerous opportunities to speak on his behalf permitted the instate inmate, Mr. Pederzani stated quite emphatically that the personal statements "are weighed by the Board in a significant manner." He added that "it

could be very helpful or it could hurt him." [5]

Moreover, the importance to the inmate in terms of psychological gratification and personal rehabilitative needs cannot be lightly ignored. "The parole-granting process is ... the most critical concern for the vast majority of all prisoners since it constitutes, in effect, a resentencing." D. Rudovsky, A. Bronstein, & E. Koren, *The Rights of Prisoners*, 119 (1983). Appearing before the Board to ask questions and to speak on his behalf inspires the inmate, not unjustifiably, to believe that he is actively participating in critical decisions concerning his rehabilitation and future confinement, that he is not just a name on a piece of shuffled paper.

This court therefore concludes that out-of-state inmates are being denied the benefit of a critical procedure freely afforded to in-state inmates in the form of a meaningful opportunity to appear before the Board and speak on their behalf. The Board's justification for this difference in treatment must now be examined.

The Board appears to offer two justifications for treating out-of-state inmates differently. This court must determine whether they are legitimate state objectives and whether the different treatment rationally furthers these objectives. *Western and Southern Life Ins. Co. v. State Bd. of Equalization of Calif.*, 451 U.S. 648, 669, 101 S.Ct. 2070, 2083–84, 68 L.Ed.2d 514 (1981).

■ First, the Board contends that "historically," inmates have been transferred out of state because they are considered by the Department of Corrections to be "behavioural problems." In many cases these inmates, according to the Board, are dangerous. Transporting them to and from Rhode Island once or twice a year presents dangers to the public.

It is certainly clear that it is a legitimate objective of the Department of Corrections to ensure that those within its keep do not

harm the public. What is less clear, however, is that denying hearings to all out-of-state inmates is a rational means of furthering that objective.

As an initial matter, this court notes that the Board's concern with security is less than clearly revealed in the circumstances of this case. Mr. Bishop was informed that he could appear before the Board if he paid the costs of transportation. It is unclear to this court how legitimate concerns for security are at all altered depending upon who foots the bill.

What is most troubling about the Board's policy, however, is that not only is it premised upon an unfounded generalization about out-of-state inmates, but it is also entirely inconsistent with the Board's express policy of periodically reviewing the eligibility of all inmates after they initially become eligible for parole.

■ It may be true that some inmates are transferred out of state because they are "behavioural problems." But many are not. Some are transferred because other facilities are better equipped to meet their particular rehabilitative requirements. Some are transferred to alleviate overcrowding. Some request the transfer. Some, in fact, as the State's brief indicates, are transferred for their own safety, to protect them from inmates within the Rhode Island facility. In short, not all transferred inmates are dangerous, and while this court recognizes that distinctions by the state need not be drawn with absolute precision, *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979), a distinction based upon an unsupportable assumption about a particular group conflicts with the guarantees of equal protection. *See Kirchberg v. Feenstra*, 609 F.2d 727, 733 (5th Cir.1979), *aff'd* 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1980).

Moreover, closer examination of the Board's justification reveals a more profound deficiency. The Board argues that out-of-state inmates are too dangerous to

---

5. It is noteworthy that although the State insists that up-to-date reports are provided to the Board by the institutions, the most recent report contained in Mr. Bishop's file was over three years old.

be transported to parole hearings. Yet the very purpose of this particular parole review proceedings is to determine whether the inmates has been suitably reformed and is ready and able to reintegrate into society. *Morrisey v. Brewer*, 408 U.S. 471, 478–89, 92 S.Ct. 2593, 2598–04, 33 L.Ed.2d 484 (1972). This court is unable to comprehend how the Board can make an initial determination that an inmate is too dangerous to attend a proceeding that is specially created for the purpose of determining whether in fact the inmate can safely return to the company of freemen. The Board has chosen to consider for possible release all inmates every six months to one year after the inmate first becomes eligible for parole. That is the Board's policy. It must be inferred from this that the Board realistically considers these inmates to be possible candidates. Yet implicit in the Board's justification for excluding out-of-state inmates is the presumption that they are not possible candidates. The Board's justification, therefore, is entirely inconsistent with its express policy of periodic review.

This court therefore concludes that denying all out-of-state inmates an opportunity to appear at their discretionary review hearings is not a rational way to further the state's interest in security.

The Board's second justification is a simple one: cost. It argues that there are currently twenty-nine inmates in facilities outside Rhode Island and to transport these inmates once or twice a year would be prohibitively expensive. There can be no question that the State saves money by not transporting out-of-state inmates to appear before the Parole Board. But saving money never justifies a difference in treatment; it may motivate it, but never justify it. Most, if not all, distinctions drawn by the state are compelled because the state's resources are not inexhaustible. Some people receive a particular benefit or treatment and others do not. But the state must provide a principled justification to explain why some win and some lose, to explain why Group A may tap the state's limited coffers and Group B may not. Otherwise, a state would be permitted to dis-

tribute its resources arbitrarily and inconsistently, claiming simply that there is just not enough to be fair.

This court also notes that the state's predicament is not as bleak as it portrays. Of the twenty-nine out-of-state inmates, approximately one-third are involuntary transfers. This court sees a principled distinction between an inmate who voluntarily chooses to serve his sentence in a distant prison and one who is compelled to move, like the plaintiffs in this case, to suit the needs of the State Corrections Department. Therefore, any rule this court fashions today will involve only involuntary transfers.

For the foregoing reasons, this court holds that denying out-of-state inmates a personal appearance before the Parole Board in discretionary review proceedings when in-state inmates are routinely permitted to appear violates the Equal Protection Clause of the Fourteenth Amendment. This ruling applies prospectively, so that for all discretionary review proceedings occurring after this date in which the out-of-state inmate's parole eligibility is being considered, that inmate must be transported at state expense to the facility in which the Parole Board sits and be permitted the same opportunity to speak on his behalf that is presently being afforded in-state inmates.