Henry CARTER et al., Plaintiffs,

v.

Paul D. McGINNIS, Commissioner of Corrections of the State of New York, et al., Defendants.

Civ. No. 1970–539.

United States District Court, W. D. New York.

Nov. 21, 1972.

Herman Schwartz, Buffalo, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of State of New York (John H. Stenger, Sp. Asst. Atty. Gen., Buffalo, N. Y., of counsel), for defendants.

CURTIN, District Judge.

In this action, the plaintiffs [1] raise several claims which arise out of their confinement in segregation at the Attica Correctional Facility and which allege violation by the defendants of various rights secured by the United States Constitution and 42 U.S.C. § 1983. This court has jurisdiction of the action under 28 U.S.C. §§ 1343(3) and 2201.

Pending at present are a motion for summary judgment by the plaintiffs which in effect seeks declaratory relief [2] on their third claim, and a cross-motion by the defendants which asks dismissal of the complaint for failure to state a claim upon which relief can be granted.[3] The plaintiffs' third claim is that their confinement in segregation violated the Due Process Clause of the Fourteenth Amendment because prior to being so confined they were not afforded (1) written notice of the charges against them, (2) opportunity to confront any accusers, (3) opportunity to present evidence on their own behalf, (4) counsel or counsel substitute, (5) hearings before an impartial tribunal, (6) reasons for the sanctions imposed, (7) transcripts of the proceedings and (8) other essential procedural safeguards.

The factual setting in which the instant motions have been made is as follows.

On November 2–4, 1970, an inmate uprising occurred at the Auburn Correctional Facility. Shortly thereafter the plaintiffs were transferred to Attica and placed in segregation without being notified of any charges against them or informed of the reasons for their special confinement. After the instant action was commenced, this court was told that the plaintiffs' stay in segregation would continue until an investigation of the Auburn disturbance was completed. Concluding that these facts established a violation of the plaintiffs' rights under the Due Process Clause, the court on December 15, 1970 ordered that the plaintiffs be afforded Superintendent's Proceedings in accordance with the Department of Correctional Services' own "Procedures for Implementing Standards of Inmate Behavior and for Grant-

1. One of the intervening plaintiffs, Thomas Hicks, is dead and will not be discussed further in this opinion.

2. Upon motion of the plaintiffs, the court, on September 21, 1972, ordered that the complaint in this action be amended by deletion of the prayer for injunctive relief.

3. The parties agree that the court's decision of December 15, 1970, which granted relief on the plaintiffs' first claim, does not preclude the court from considering the instant motion. The earlier decision provided that the court would "retain jurisdiction until all the other matters presented in the plaintiffs' complaint and amended complaint, but not discussed in ruling on this motion, are adjudicated." 320 F.Supp. 1092 at 1098.

ing Good Behavior Time Allowances," 7 N.Y.C.R.R. 250.1 et seq. 320 F.Supp. 1092. The Superintendent's Proceedings conducted in accordance with the court's order fell into two groups.

On December 17, 1970, plaintiffs Carter, Johnson, Tanner, Thompson and Brown were each presented with written charges alleging specific acts of misconduct during the Auburn uprising. The charged acts arguably constituted crimes under the New York Penal Law or evidence of crimes. Carter, Tanner and Brown were also charged with kicking correction officers during their transfer from Auburn to Attica. The officer who delivered the charges told the five inmates that he had been assigned to assist them, presumably in investigation and preparation of their responses to the charges, but all refused his help, Brown and Carter asking for counsel and Johnson explaining that he could not trust the assistance of a correction officer. Later in the day the hearings commenced. The Superintendent called in each of the inmates, told him of the nature of the hearing, asked whether the charges had been served and assistance offered, and requested him to plead. Each inmate either stood mute or asserted his privilege against self-incrimination guaranteed by the Fifth Amendment, and Brown and Carter also demanded one or more of the rights stated in the third claim of their complaint, which demands were denied. The inmate was then sent from the room, and Auburn correction officers, sometimes identifying the inmate from photographs, gave unsworn testimony about their observations of his activities during the Auburn disturbance and the trip to Attica. Several affidavits attesting to the same activities were also made part of the record. Then the Superintendent called the inmate back and summarized the evidence against him. Each inmate again refused to respond except to assert his Fifth Amendment privilege or to claim other rights. The Superintendent thereupon sustained the charges and sentenced the inmate to sixty days in segregation and a loss of good time ranging from 270 days to a year.

On December 23, 1970, the Attica Superintendent went to Auburn and interviewed unsworn Auburn correction officers about the activities of plaintiffs Lewis, Goddard, Gonzalez and Plummer during the disturbance. On December 27 each of the four inmates received written charges relating to the disturbance and an offer of assistance, which was refused. As had been the case with the other plaintiffs, the charged acts arguably constituted crimes under the New York Penal Law or evidence of crimes. On December 28 the Superintendent informed each inmate of the charges and testimony against him and asked for a response thereto. Goddard denied the charges against him, while the other three inmates pleaded their Fifth Amendment privilege. Goddard, Gonzalez and Plummer each denied knowing some of the correction officers who gave evidence against them, and Gonzalez testified in some detail about his whereabouts on November 4. As on December 17, the Superintendent affirmed the charges and sentenced the inmates to sixty days in segregation and losses of good time ranging from ninety days to a year.

The court's order of December 15 provided that, if the plaintiffs were sentenced to segregation, they were to be given credit for time so spent prior to the hearings. 320 F.Supp. at 1098. In sentencing the Superintendent followed the direction of the court but, at the expiration of their sixty-day sentences, the plaintiffs continued to be held in segregation. The plaintiffs then applied to the court for further relief, and there was held a hearing at which correctional officials testified about the plaintiffs' continued special confinement. In an oral decision rendered January 26, 1971, the court concluded that no showing had been made that the plaintiffs constituted a threat to the security of the Attica Correctional Facility and found that they were being held in segregation solely on the ground that an investigation of

the Auburn disturbance was continuing. Citing Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970), and Davis v. Lindsay, 321 F.Supp. 1134 (S.D.N.Y.1970), the court issued an injunction requiring the release of the plaintiffs from segregation.

During the month of January, 1971 a grand jury was convened in Cayuga County to investigate the Auburn uprising. Although all of the plaintiffs were presumably possible targets of the grand jury, only plaintiff Johnson was included among the six persons against whom indictments were returned. He later pleaded guilty to a misdemeanor charge and was sentenced to a term in the Cayuga County Jail.

 Before turning to the substantive issues in the case, the court notes that the plaintiffs do not state that they appealed their sentences in the Superintendent's Proceedings to the Commissioner of Correctional Services before instituting the instant action, and that the defendants do not claim that the action is therefore barred under Eisen v. Eastman, 421 F.2d 560, 567–569 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S. Ct. 82, 27 L.Ed.2d 75 (1970). It is questionable whether the administrative exhaustion requirement stated in *Eisen* is still viable in light of Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), and Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L. Ed.2d 569 (1972), but this question need not be determined here. Even under *Eisen*, the plaintiffs would not be required to appeal their sentences to the Commissioner before seeking judicial relief. First, they challenge the constitutionality of the Department of Correctional Services' "Procedures for Implementing Standards of Inmate Behavior and for Granting Good Behavior Time Allowances" as applied to the undisputed facts of their case, and administrative appeal

would be "certainly or probably futile." Eisen v. Eastman, *supra*, 421 F.2d at 569. Second, although the plaintiffs' losses of good time were deemed "tentative until such time as [they] actually affect[ed] consideration for parole or for conditional or other release" and were thus not necessarily subject to confirmation or modification by the Commissioner until that time, Section 260.-4(b), 7 N.Y.C.R.R. 260.4(b), the plaintiffs' objections to the procedures employed at their disciplinary hearings were subject to "automatic review" by the Commissioner under Section 270.-2(a)(2), 7 N.Y.C.R.R. 270.2(a)(2), because they were sentenced to more than thirty days in a special housing unit.

The plaintiffs make several arguments in support of their contention that the punishment[4] imposed on them violated the Due Process Clause. Each of the arguments advances a reason why the Due Process Clause required that procedural safeguards in addition to those mandated by Sostre v. McGinnis, 442 F. 2d 178, 194–199 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L. Ed.2d 740, cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), be afforded the plaintiffs before they were punished. First, the plaintiffs argue that Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), in effect overruled *Sostre* and that the safeguards specified in *Morrissey* are required in prison disciplinary proceedings as well as in the parole revocation process. Second, they argue that *Sostre* leaves open the question whether procedural guarantees beyond those specified therein may be required in some disciplinary proceedings and that additional guarantees are required where the offenses charged arise out of a confrontation between inmates and correction officers and problems relating to identification of the of-

---

4. Although the plaintiffs' complaint refers only to their confinement in segregation and does not speak of the loss of good time imposed on them as punishment, the propriety of both types of punishment was

"tried by . . . implied consent of the parties" and therefore "shall be treated in all respects as if [it] had been raised in the pleadings." Fed.R.Civ.P. 15(b).

fending inmate may be present. Third, they argue that procedural rights beyond those set forth in *Sostre* are required by virtue of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the disciplinary offenses charged also constitute crimes or are so closely related to criminal conduct that interrogation might elicit evidence of crimes. The court believes it unnecessary to reach the plaintiffs' first two arguments, for it finds merit in the third and determines that the punishment meted out to the plaintiffs in the disciplinary hearings conducted on December 17 and 28, 1970 was imposed in violation of the Due Process Clause.

■ In the instant case, the disciplinary offenses with which the plaintiffs were charged also constituted crimes under the New York Penal Law or were so closely related to criminal conduct that interrogation of the plaintiffs might have elicited evidence of crimes.[5] A discussion of the significance of this fact must begin with consideration of Miranda v. Arizona, *supra*.

■ In *Miranda*, the Supreme Court recognized that custodial interrogation of a person suspected of a crime "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. at 1624. Consequently the Court held that,

when a person suspected of criminal conduct is held in custody and "subjected to questioning, the privilege against self-incrimination is jeopardized [and] [p]rocedural safeguards must be employed to protect the privilege . . . ." *Id.* at 478, 86 S.Ct. at 1630. As for the procedural safeguards to be employed, the Court required that prior to any questioning the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to have an attorney present during questioning.

■■ The subsequent case of Mathis v. United States, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), indicates that questioning an imprisoned suspect constitutes custodial interrogation even when he is in custody for an entirely separate offense and the interrogation is not intended to elicit evidence for criminal prosecution. Under *Mathis, Miranda* applies to custodial interrogation when there is "the possibility" that the matter will "end up in criminal prosecution." 931 U.S. at 4, 88 S.Ct. 1503. *See also* Blyden v. Hogan, 320 F.Supp. 513, 519 (S.D.N.Y.1970). Consequently, because of the nature of the offenses with which the plaintiffs were charged, the questioning conducted at their disciplinary hearings constituted custodial interrogation which should have been preceded by the giving of *Miranda* warnings.[6]

5. Even if a prison disciplinary offense were not itself a crime, it might be so closely related to criminal conduct that interrogation at a disciplinary hearing might elicit evidence of a crime. *See* Rodriquez v. McGinnis, 451 F.2d 730, 733–737 (2d Cir. 1971) (dissenting opinion). In *Rodriquez*, the disciplinary charge was possession of contraband (apparently not a crime), but the questioning concerned how the prisoner acquired the contraband. If the prisoner had not refused to answer the questions asked him, he might have implicated himself in a criminal conspiracy to smuggle contraband into the prison. The panel's decision denying relief to the prisoner was overturned and the decision of the district court granting relief on other grounds was affirmed by the Sec-

ond Circuit *en banc.* 456 F.2d 79 (2d Cir. 1972).

6. Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971), cert. denied, 404 U.S. 809, 92 S.Ct. 35, 30 L.Ed.2d 40 (1971), in no way indicates that *Miranda* is inapplicable to prison disciplinary proceedings. There the Court of Appeals affirmed this court's denial of a request that it enjoin interrogation of inmates by the New York State Attorney General's staff in the aftermath of the Attica rebellion unless the individual inmates had consulted with counsel and the interrogation occurred only in the presence of counsel. The court did not question the applicability of *Miranda* to the interrogations but rather based its af-

**793**

Nevertheless, the plaintiffs did not receive the *Miranda* warnings prior to questioning. As a result, of course, statements obtained from them could not be used affirmatively against them in subsequent criminal prosecutions. *See* N.Y.Atty.Gen.Op. 409/70, Feb. 11, 1971, reported in 8 Crim.L.Rep. 2486 (1971); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). *Cf.* Melson v. Sard, 131 U.S. App.D.C. 102, 402 F.2d 653 (1968) (parole revocation hearing). Ordinarily, application of this exclusionary rule would adequately protect a suspect's Fifth Amendment privilege against self-incrimination. Where a person is faced with the possibility of being penalized for the same criminal conduct in an administrative proceeding as well as in a criminal prosecution, however, the exclusionary rule gives insufficient protection to the privilege, and additional protection may be required.

Such is the situation in the instant case. On the one hand, application of the exclusionary rule as a result of failure to give the *Miranda* warnings would not have protected the plaintiffs against the risk of unintentionally incriminating themselves by "volunteering" statements, see Miranda v. Arizona, *supra*, 384 U.S. at 478, 86 S.Ct. 1602, or against the use of involuntary statements for impeachment purposes in subsequent criminal prosecutions. *See* Harris v. New York, *supra*; Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12, 27 (2d Cir.) (opinion concurring in part and dissenting in part), cert. denied, 404 U.S. 809, 92 S.Ct. 35, 30 L.Ed.2d 40 (1971). On the other hand, by recognizing the possibility of self-incrimination and refusing to make any statements, the plaintiffs sacrificed their only means of defense and left themselves open to the possibility of being penalized for their silence. *Compare* Inmates of Attica Correctional Facility v. Rockefeller, *supra*, 453 F.2d at 22 (interrogators were not correctional personnel and inmates were therefore shielded from disciplinary action in reprisal for refusal to talk when questioned).[7] Under the Department of Correctional Services' "Procedures for Implementing Standards of Inmate Behavior and for Granting Good Behavior Time Allowances," the plaintiffs had no opportunity to cross-examine the witnesses against them or to present evidence and witnesses on their own behalf. Moreover, whatever assistance they might be given pursuant to Section 253.3, 7 N.Y.C.R.R. 253.3,[8] would not provide a means of defense in the cir-

firmance on the ground that the court had been assured by counsel that *Miranda* was being followed and therefore no need for an injunction existed. *Id.* at 21. At the conclusion of its discussion of the interrogation problem, the court noted that "[d]enial of plaintiffs' application is, of course, without prejudice to their due process rights in any disciplinary proceeding that might be instituted against them." *Id.* at 22.

7. In regard to the possibility that the plaintiffs were punished for remaining silent in the face of questioning, it is perhaps noteworthy that the plaintiff—Gonzalez—who testified at some length about his activities during the Auburn incident lost far less good time than the other plaintiffs as a result of the disciplinary proceedings conducted against them.

8. Section 253.3 reads as follows:
253.3 Notice and assistance to inmate. (a) The person appointed to conduct the proceedings shall designate an employee to furnish assistance to the inmate.
(b) Such employee shall deliver a copy of the charge to the inmate and shall explain the nature of the proceeding and the charge to the inmate. He also shall ask the inmate whether there is any factual matter that can be presented in his behalf and he shall investigate any reasonable factual claim the inmate may make.
(c) A written report of the action taken and the results of the investigation, if any, by the person designated to furnish assistance to the inmate shall be delivered to the person appointed to conduct the proceeding prior to the commencement of the procedure for determination of the charge.

cumstances of this case. Leaving aside any questions relating to the assisting correction officer's discretion to disregard defenses raised by the inmates, his willingness to aid the inmates as fully as possible and his ability to investigate events which occurred at a different correctional facility, it is not clear that any privilege would preclude use in subsequent criminal proceedings of statements made to the officer, either because they were "voluntarily" made or for purposes of impeachment.

■ At the time of their disciplinary proceedings, the plaintiffs therefore faced "a choice between the rock and the whirlpool." Garrity v. New Jersey, 385 U.S. 493, 496, 87 S.Ct. 616, 618, 17 L. Ed.2d 562 (1967). They had to either give up their right to remain silent in order to defend themselves or remain silent and leave themselves without any possible means of defense. Their punishment upon remaining silent therefore impermissibly penalized their exercise of the Fifth Amendment privilege. *See* Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Garrity v. New Jersey, *supra*; Melson v. Sard, *supra*.

The dilemma faced by the plaintiffs in the instant case was recognized in Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971). Although *Clutchette* differs from the instant case in that *Miranda* warnings were given prior to questioning at disciplinary hearings, the dilemma faced by the inmates there was identical to that faced by the plaintiffs here, who knew of their Fifth Amendment privilege against self-incrimination without being warned. *Clutchette* stated as follows:

> In a *Miranda* situation, the only consequences of the accused's exercising his right to remain silent are that the police stop asking him questions. .
>
> In a situation involving a prisoner before the disciplinary committee, . . . the coercive nature of the questioning, while perhaps more subtle than that in *Miranda,* is also more

devastating. The prisoner, warned that anything he says may be used against him in a criminal prosecution, is put to the choice between remaining silent and sacrificing his right to defend himself before the committee, or speaking to the committee and risking incriminating himself in a future prosecution. The trap is unavoidable. Not only does he risk multiple punishment for the same act . . . he definitionally prejudices himself in one proceeding by acting in his best interests in the other.

> \* \* \* \* \* \*

> In any proceeding in which an accused party exercises his right to remain silent, he naturally sacrifices one means of defense. In the normal criminal prosecution, or civil-criminal combination, we are not troubled by this sacrifice, as the defendant is protected by many procedural safeguards, and retains the alternative of defending himself by means of calling and cross-examining witnesses. In a disciplinary proceeding, prisoners are not protected by these same procedural safeguards, i. e., a presumption of innocence with the burden of proof beyond a reasonable doubt on the state. Furthermore, should the charged prisoner choose to exercise his right to remain silent, he is stripped of any possible means of defense. The choice thus put to him of sacrificing one fundamental right as a price for exercising another is repugnant to our notions of due process. United States v. Jackson, 390 U.S. 570, 581–585, 88 S. Ct. 1209, 20 L.Ed.2d 138 (1968); Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

328 F.Supp. at 778, 779.

*Clutchette* sought to resolve this dilemma by holding that when an inmate is subjected to a disciplinary hearing for engaging in conduct which may also be prosecuted as a crime, he must be given (1) the right to an attorney to help him make the choice between exercising the Fifth Amendment privilege and waiving

it to speak in his own defense, and (2) the right to cross-examine and call witnesses.

The *Clutchette* solution is not the only possible means of resolving the constitutional dilemma present in the instant case. *See* Turner & Daniel, Miranda in Prison: The Dilemma of Prison Discipline and Intramural Crime, 21 Buf.L. Rev. 759, 764–773 (1972). While the plaintiffs urge the court to follow the course taken in *Clutchette*, the defendants argue that a means more consistent with the holding in Sostre v. McGinnis, *supra*, would be for the court to imply an immunity against the affirmative use in any subsequent criminal proceeding of statements made in a prison disciplinary hearing. *See* Melson v. Sard, *supra*. *See also* Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 426 F.2d 619, 626–627 (2d Cir. 1970).

For the purpose of determining the instant case, however, it is unnecessary for the court to determine which course should be followed in future disciplinary proceedings where the offenses charged also constitute crimes or are so closely related to criminal conduct that interrogation might elicit evidence of crimes. Regardless of the means chosen for the future, the fact remains that at the hearings conducted on December 17 and 28, 1970 the plaintiffs were neither provided the procedural safeguards required by *Clutchette* nor informed that they were immune from use in subsequent criminal proceedings of statements they might make. *Compare* Melson v. Sard, *supra*; Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, *supra*. The plaintiffs were therefore forced to choose between remaining silent and sacrificing their right to defend themselves, and speaking and risking self-incrimination in future criminal prosecutions. It is therefore clear, and the court so declares pursuant to 28 U.S.C. § 2201, that the sentences imposed on the plaintiffs in the aforementioned disciplinary proceedings unconstitutionally penalized their exercise of the Fifth Amendment privilege against self-incrimination.

To the extent herein provided, the plaintiffs' motion for summary judgment is granted. In all other respects, the plaintiffs' motion is denied. The defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted is denied. Because the plaintiffs' claims other than the first and the third have not been the subject of further motions or briefing, however, the court considers them to have been abandoned, and they are dismissed, with leave to move to reinstate any of them within ten days of the entry of this decision. Plaintiffs to submit judgment on three-day notice.

So ordered.