**James NEWKIRK, Plaintiff-Appellee,**

v.

**Harold N. BUTLER, Superintendent, of Wallkill Correctional Facility, and Peter Preiser, Commissioner of Correctional Services, Defendants-Appellants.**

**No. 979, Docket 73-2858.**

United States Court of Appeals,
Second Circuit.

Argued May 9, 1974.

Decided June 3, 1974.

Certiorari Granted Oct. 21, 1974.
See 95 S.Ct. 172.

Hillel Hoffman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.

Daniel Pochoda, New York City (William E. Hellerstein, Marjorie M. Smith, The Legal Aid Society, Prisoners' Rights Project, New York City, of counsel), for plaintiff-appellee.

Before ANDERSON, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

On June 8 and 9, 1972, appellee James Newkirk and four other inmates of Wallkill Correctional Facility ("Wallkill" herein), a medium security institution, were summarily transferred to maximum security facilities in New York in response to their alleged activities in support of a prisoners' union at Wallkill. Newkirk and three of the other four brought suit in the Southern District of New York pursuant to 28 U.S.C. § 1343(3), (4), and 42 U.S.C. § 1983 against the Superintendent of Wallkill and the State Commissioner of Correctional Services for a declaration that the transfers were in violation of the Constitution and laws of the United States and for injunctive relief. Prior to a decision in the action, which was tried in November, 1972, before Judge Robert J. Ward, sitting without a jury, all plaintiffs except Newkirk were released on parole and the action was dismissed as to them. Newkirk was returned to Wallkill but the action continued as to him. In a decision dated October 9, 1973, the district court held that the transfer violated the due process clause of the Fourteenth Amendment since it had been made without any explanation to Newkirk or opportunity to be heard. On October 23, 1973, the court entered a declaratory judgment accordingly, which, while denying injunctive relief, directed that no adverse parole action be taken against Newkirk, or punishment administered, because of the transfer and that Newkirk be told the "scope of permissible behavior at Wallkill and the circumstances which . . . would warrant his transfer to another prison." The Superintendent and State Commissioner appeal. With modification we affirm.

Wallkill is a unique state correctional facility because it permits its inmates, who live in rooms rather than cell blocks, maximum free time and freedom of movement and gives access to numerous recreational and rehabilitative programs not available at other state correctional facilities. Because of its several advantages, which are more fully described in the district court's opinion, see 364 F.Supp. 497 (S.D.N.Y.1973), admission to Wallkill is generally sought after and usually comes only after a state prisoner has spent time at a maximum security facility and has undergone an extensive screening procedure.

Appellee Newkirk, after being convicted of second degree murder in 1962, was incarcerated at Sing Sing and Green Haven before first applying in 1965 for admission to Wallkill, to which he was not admitted until 1971. At Wallkill he took instruction in auto mechanics, attended classes in mathematics, history and English, and, during his leisure time, played musical instruments and pursued other artistic interests. Newkirk also drove a truck at Wallkill and at times was per-

mitted to leave the prison grounds as part of this employment.

Sometime prior to June 1972 several Wallkill inmates began circulating petitions to form an inmates' union. These activities were openly opposed, not by prison officials but by members of the elected Inmate Liaison Committee (the "Committee"), which had general responsibility for the processing of inmate grievances. On June 2, 1972, the Committee held a general meeting of the inmates at which it disclaimed any support for the union. The discussions at this meeting, although vociferous, were not violent. Newkirk, who had previously signed a proposed union constitution, did not attend this meeting but immediately prior to it received a union petition from a fellow inmate, signed it, and passed it along to another inmate.

Concerned about a possible threat to the stability of the prison, Lieutenant Connolly, the officer in charge of Wallkill on the evening of June 2, a Friday, telephoned reports to Superintendent Butler who had left Wallkill and was at his home for the weekend. Connolly also prepared a written report for Assistant Deputy Superintendent O'Mara in which he identified, based on what other officers had told him,[1] Newkirk as one of the inmates who had been canvassing for the union. On Tuesday, June 6, O'Mara recommended to Butler that eight inmates, including Newkirk, be transferred from Wallkill. Before making his recommendations O'Mara did not talk to Newkirk[2] and did not know who had observed him canvassing for the union or the extent of his activities. Butler decided to transfer Newkirk and four others on O'Mara's list without ever talking to the inmates involved and without personally observing any of their activities or even discussing the

events of Friday evening with Connolly who was the officer in charge and who had never recommended that anyone be transferred. The transfers were accomplished on June 8 and 9 when the inmates were summoned to the prison infirmary and told they were being sent away immediately. They were not told the reason or given any opportunity to contest the action.

Newkirk was transferred to Clinton Correctional Facility where he was placed in a barred cell, openable only by a guard, and was unable to pursue many of the activities he had engaged in at Wallkill. Although he asked for a job involving auto mechanics or driving, he was employed by the Clinton Superintendent as a housekeeper at a salary less than what he had earned at Wallkill. Newkirk worked for the Superintendent seven days a week, often for 13 or 14 hours per day. Visits to Newkirk by members of his family were more restricted, since Clinton is located further from New York City, where Newkirk's family lives, than Wallkill.[3] In light of these and other deprivations suffered by Newkirk, and since the transfer was in direct response to his presumed activity in support of the inmates' union, the district court rejected appellants' argument that the transfer was "administrative," and hence beyond due process requirements, because it had not resulted from formal disciplinary proceedings and had not involved any loss of good time or segregated confinement. Specifically the court declared:

"1) plaintiff Newkirk's interest in continuing to be situated at Wallkill is sufficiently great that transfers in direct response to his activity deserves some sort of 'due' process, at the very least the knowledge that it is a possibility;

---

1. Connolly could not remember specifically which officers had identified particular inmates as participants in the union organizational drive.

2. O'Mara recommended eight employees for transfer. He had talked to only one of them, Passanante, whom O'Mara placed at the bottom of his list for transfer since Pas-

sanante was "very scared" and "apparently willing to cooperate."

3. Wallkill is located approximately 80 miles north of New York City, whereas Clinton, located outside of Plattsburg, New York, is approximately 300 miles from New York City.

"2) transfer from Wallkill to maximum security institutions is used by the defendants for disciplinary purposes;

"3) plaintiff Newkirk could not be transferred without being afforded due process, including

    a) prior notice of the rules of the institution and what acts on his part would lead to his being transferred;

    b) a hearing at which he was informed of the charges against him and afforded an opportunity to explain his behavior before a relatively impartial tribunal either prior to the transfer or if prompt action is essential, as soon thereafter as practicable; . . . ."

The court entered the above-described judgment (*supra,* p. 2) and denied appellants' requests for a resettlement which would limit the judgment to cases involving disciplinary transfers only and for a stay of that portion of the judgment directing appellants to notify Newkirk of the conduct that would lead to transfer from Wallkill.

Appellants argue that a hearing may be constitutionally required only for "disciplinary" transfers—i. e., transfers made as punishment for past rule violations.[4] See 7 N.Y.C.R.R. Part 250, et seq. They urge that transfers for other purposes (e. g., transfer to separate inmates who are hostile to each other or to prevent threatened disturbances before they occur, which involve no formal disciplinary proceedings, loss of good time, segregation, or adverse parole consequences) be classified as purely "administrative" and left within the exclusive discretion of prison officials. Besides being inappropriate in these cases, appellants argue, notice and a hearing might touch off exactly the disturbance which a transfer could avoid.

■■ Classification by label (e. g., as "administrative" or "disciplinary") may facilitate prison administration but it cannot be used as a substitute for due process. In our view appellees' position gives insufficient consideration to the very real loss that an inmate may suffer even when his transfer is not part of formal disciplinary proceedings and has no adverse parole consequences. It also overlooks the danger that a transfer, when based on rumor or "confidential" information about an inmate's behavior, past or planned, may be arbitrary and unjustified by the facts. These factors, the adverse consequences to the prisoner and the chance of error, are the principal elements to be considered in determining what process is due the transferred prisoner, rather than the label put on the transfer. Where the prisoner suffers substantial loss as a result of the transfer he is entitled to the basic elements of rudimentary due process, i. e., notice and an opportunity to be heard. See Gomes v. Travisono, 490 F.2d 1209 (1st Cir. 1973); Ault v. Holmes, 369 F. Supp. 288 (W.D.Ky.1973); Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H.1973); White v. Gillman, 360 F.Supp. 64 (S.D. Iowa 1973); Capitan v. Cupp, 356 F. Supp. 302 (D.Or.1972). See also Landman v. Royster, 333 F.Supp. 621, 645 (E.D.Va.1971) (questioning distinction between deprivations constituting "punishment" and those presented as techniques for the maintenance of "control" or "security"). While no formal disciplinary proceedings were involved in the present case the district court found that Newkirk was deprived of living conditions and job and training opportunities for which he had waited for six years and which he was apparently eager to retain. Since this was a substantial loss he was entitled to know the reasons for the transfer, to be heard, and to

4. Appellants' brief (p. 22) states:
"Appellants do not quarrel here with the District Court's order insofar as it holds that, as a matter of law, if an inmate is transferred from Wallkill Correctional Facility solely as a disciplinary punishment in response to an act of misconduct, the inmate must, before or shortly after such

transfer, be given notice of the gravamen of the misconduct and an opportunity to be heard in relation thereto. Indeed the regulations of the Department of Correctional Services require that disciplinary punishments be preceded by notice and hearing before punishment may be imposed (see 7 N.Y.C.R.R. Part 250 et seq.)."

be permitted to demonstrate the existence of factual errors in the basis for the discharge. Since his right to minimum due process is clear in the circumstances of this case, it becomes unnecessary for us to decide whether some form of due process is required in the case of every transfer of a prisoner. See Gomes v. Travisono, *supra* at pp. 1213–1214.

Nor can a denial of due process to Newkirk be justified on the ground that his transfer was intrastate rather than to a prison outside the state (the situation in *Gomes*), since the deprivations in both cases were, as a practical matter, equally severe.[5] See Stone v. Egeler, 377 F.Supp. 115 (W.D.Mich. 1973); Aikens v. Lash, 371 F.Supp. 482 (N.D.Ind.1974); White v. Gillman, *supra*. "In a prison setting where liberty is by necessity shrunken to a small set of minor amenities, such as work or schooling privileges, visitations, and some modicum of privacy, it is likely that any marked change of status which forecloses such liberties will be perceived and felt as a grievous loss." Palmigiano v. Baxter, 487 F.2d 1280, 1284 (1st Cir. 1973). See also Diamond v. Thompson, 364 F.Supp. 659, 664 (M.D.Ala.1973). Indeed, in light of our decision that a substantial deprivation of benefits and privileges within the prison walls itself entitles a prisoner to some form of due process, see Sostre v. McGinnis, 442 F.2d 178 (2d Cir.), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), it would be something of a paradox if prison authorities could by transferring a prisoner for disciplinary reasons to another institution (within or without the state) deprive him of due process rights to which he would be entitled upon a transfer within the prison itself.

Fundamental fairness furthermore requires that substantial deprivations "should at least be premised on facts rationally determined." See Sostre v. McGinnis, *supra* at 198;. United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968) ("the relevant facts . . . must not be . . . capriciously or unreliably determined."); Dunn v. California Dept. of Corrections, 401 F.2d 340, 342 (9th Cir. 1968); Shelton v. United States Board of Parole, 128 U.S.App.D.C. 311, 388 F.2d 567, 576 (1967) (en banc.).[6] Here the need for at least a rudimentary hearing, with Newkirk afforded a reasonable opportunity to explain his activities, was obvious. The Superintendent's decision to transfer Newkirk as a leading proponent of the inmates' union was based only on third-hand reports prepared by officers who had not personally observed Newkirk's conduct which, as it turns out, had apparently been limited to the single act of signing and passing along a union petition. A hearing might well have established that he was but a passive pawn in a larger power struggle,[7] who had not intended to involve himself in further union activities, particularly if they would jeopardize his continued presence at Wallkill.[8] Indeed, with respect to one of the other inmates transferred, the Superintendent conceded at the trial in the district court that a further investigation would have revealed significantly less involvement with the union than had originally been supposed. Where no hearing at all is granted and

---

5. For example one of the privations referred to in *Gomes* was the increased difficulty of communication and visitation. See also Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972). Due to the increased distance of Clinton from New York City, see note 3 *supra*, and more limited telephone privileges, the same privations were suffered here.

6. It is irrelevant, as appellants seem to suggest, whether the factual inquiry has anything to do with the possible commission of a crime or other rule violation. See Gold-

berg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1968).

7. According to Assistant Deputy Superintendent O'Mara, it was "reliably" reported that one union petition circulating through the Wallkill population included 225–230 signatures.

8. We note that the one prisoner who was forewarned of his possible removal from Wallkill, Passanante, quickly indicated his willingness to cooperate and, as a result, was placed at the bottom of O'Mara's list for transfer. See note 2 *supra*.

the inmate is never given any opportunity to respond to or contradict reports of his activities or intent, the risk of such mistakes is substantial. See Gomes v. Travisono, 353 F.Supp. 457, 462 (D.R.I.), affd., 490 F.2d 1209 (1st Cir. 1973).

Turning to the district court's judgment, we believe that, with one or two modifications, it satisfactorily prescribes the minimum due process to which Newkirk is entitled. At the same time it does not attempt to foist a formal-type notice or hearing on the state. Presumably the form will be molded to suit the seriousness of the charges in each case and the deprivations threatened by the transfer. Furthermore the order recognizes that under some circumstances there may be compelling reasons for immediate transfer without notice and prior to hearing (e. g., where the transfer is made because of fear of an imminent prison uprising or because of fire, flood, outbreak of an epidemic, or the like) and accordingly provides that "if prompt action is essential" the hearing may be held as soon after the transfer "as practicable." This provision permits prison officials to act immediately in instances where notice will touch off the very disturbances which the transfer is designed to avoid.

■ In one respect, however, we believe that the order requires modification. Paragraphs (1) and (5)b of the order would require state prison officials immediately to inform Newkirk of all future activities or behavior on his part which would be grounds for transfer of him to another institution. While we agree that advance publication of rules governing the conduct of prisoners at Wallkill, to the extent that such rules can be formulated in clear and unambiguous terms, would serve the salutary function of avoiding misunderstanding and resentment on the part of the prison population, Rhem v. McGrath, 326 F. Supp. 681, 691–692 (S.D.N.Y.1971), it would be impossible, other than through the use of vague and meaningless generalities, to set forth all acts on Newkirk's part that could conceivably require his transfer out of Wallkill. Compliance with this portion of the district court's order, as it stands, might also preclude the flexible exercise of discretion based on changing conditions within the "volatile atmosphere of a prison," see Sostre v. Otis, 330 F.Supp. 941, 945 (S.D.N.Y. 1971). We could not affirm such a requirement without placing prison officials in an unnecessary straitjacket. We therefore hold that the final order of the district court should be modified to delete from paragraph 1 the words "at the very least the knowledge that it is a possibility," from Paragraph 3(a) that part which directs that Newkirk be given prior notice of "what acts on his part would lead to his being transferred," and all of paragraph 5(b).

■ We find no merit in appellants' additional argument that Newkirk's action should have been dismissed as moot prior to the decision on the merits since prior thereto he had been returned from Clinton to Wallkill. Even after his return he remained subject to a new transfer at any time based on mere rumor or surmise which he had no opportunity to answer or refute. In light of the state's continued insistence on its policy of not providing the inmate with any opportunity to respond to information against him, the likelihood of such a transfer was concrete rather than remote, speculative, or contingent. See Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1, 42 U.S.L.W. 4507 (1974); Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L. Ed. 826 (1941); McGrain v. Daugherty, 273 U.S. 135, 181–182, 47 S.Ct. 319, 71 L.Ed. 580 (1927). See generally Diamond, Federal Jurisdiction to Decide Moot Cases, 94 U.Pa.L.Rev. 125, 137–47 (1945). Furthermore, notwithstanding the Superintendent's good faith assurances in support of appellants' motion for dismissal that there would be no adverse effects from the transfer as far as consideration for parole was concerned, we think that Newkirk was entitled to a judicial decree to that effect.

The judgment and order of the district court is affirmed as modified.