Vernon JONES

v.

John MANSON, Commissioner of
Correction, et al.

Civ. No. H–75–61.

United States District Court,
D. Connecticut.

May 7, 1975.

Richard Cramer, Legal Assistance to Prisoners, Hartford, Conn., for plaintiff.

Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

The plaintiff is an inmate at the Connecticut Correctional Institution at Somers (hereinafter "Somers") where he is serving a sentence of not less than eight nor more than sixteen years for violation of the state narcotics law. He alleges that his due process rights were violated by the defendants' actions in summarily transferring him without a hearing from the Community Correctional Center at New Haven (hereinafter "New Haven jail") to Somers, not providing him with a post-transfer hearing for a period of two months, and not providing him with use immunity for his testimony at the hearing and/or allowing him assistance of counsel at the hearing finally provided. He brings his claim pursuant to 42 U.S.C. § 1983 (1970) and its jurisdictional counterpart 28 U.S.C. § 1343(3) (1970). A trial was held to this court and post-trial briefs have been submitted by the parties. The case is therefore ready for decision.

### Facts

The basic facts are largely not in dispute. On January 9, 1975, the plaintiff was incarcerated in the New Haven jail where he was serving his eight-to-sixteen-year sentence.[1] On that date a serious but short-lived incident occurred at the jail and the plaintiff and several others were accused of having attacked one or more guards. Defendant Manson, the Commissioner of Correction, was informed of the incident and decid-

---

1. The plaintiff had begun serving his sentence at Somers in 1970 but was transferred to the New Haven jail in September 1972. He had requested such a transfer because of his fear that other inmates might seek re-prisals against him for his testimony for the state in the prosecution of Somers inmates involved in an attack upon guards in May 1972.

ed that jail security required the immediate transfer of these men from the New Haven facility. In addition, the state police were called in to investigate the incident, creating the likelihood that criminal charges would be lodged against the individuals involved. In fact, on January 20, 1975, a warrant charging the plaintiff with assault in the second degree was issued by the Court of Common Pleas in New Haven and was lodged as a detainer at Somers. That warrant was superseded on February 26, 1975, by a bench warrant from the Superior Court for New Haven County which was also filed at Somers as a detainer against the plaintiff.

The plaintiff was transferred to Somers on the night of the incident. It is undisputed that he was not told the reasons for his transfer nor provided a hearing prior to this action. In fact, it was not until several days later that he was orally informed by one of the Somers guards of the reasons for the transfer.

At Somers, he was immediately placed in administrative segregation where all new transferees are housed for a minimum thirty-day period. The plaintiff, however, remained in segregation for a period in excess of thirty days and is still there. Through March 7, the day on which a hearing was finally conducted, it appears that he was kept there by order of the defendants. However, at the hearing he was offered the opportunity to return to the general prison population or accept transfer to an out-of-state facility; he chose instead to remain in segregation. His declination of the defendants' offer was based on his fear, well known to the defendants, that he risked attacks from other inmates because of the assistance he had provided the state in their prosecution of several Somers inmates in 1972. *See* note 1, *supra*. The plaintiff suffered some rather

pronounced deprivations as a result of his transfer. These shall be considered in greater detail *infra*.

On February 25, 1975, the plaintiff filed his original complaint in this action in which he sought an injunction compelling the defendants to conduct a hearing. A hearing was scheduled in this court for March 10 on the plaintiff's motion for a preliminary injunction. That hearing was rendered unnecessary, however, by the defendants' action in granting the plaintiff an institutional transfer hearing on March 7.

Two days prior to that hearing, the plaintiff was provided with a written notice of the charges against him. On the morning of the hearing, he requested, through his retained counsel, that said counsel be permitted to represent him at the hearing in order to protect his fifth amendment rights. The request was denied. Furthermore, the plaintiff was not offered use immunity for any testimony which he might have wished to present at the hearing. As a result, he remained silent. The hearing panel found him guilty of the assault and thereby held that his transfer to Somers was justified. However, as noted above, they did offer the plaintiff an opportunity to be placed in the general prison population or to be transferred to an out-of-state facility, both of which options the plaintiff refused.

■ On April 2, 1975, the plaintiff filed an amended complaint which charges that his due process rights were violated by the failure of the defendants to conduct a hearing prior to his transfer or expeditiously thereafter and in refusing to provide him with use immunity and allow him the assistance of counsel at the hearing that was ultimately held. It is to those claims that I now turn.[2]

2. The plaintiff has sought certification of this case as a class action. However, there has been no showing that the facts and issues involved in this case are not as unique

as they appear to be. Fed.R.Civ.P. 23(a)(2), (3). Therefore, the plaintiff's request for class certification is denied.

## Discussion

### A.

The first step in the analysis of this case must be a consideration of whether the plaintiff was entitled as a matter of constitutional law to a hearing as a result of his transfer from the New Haven jail to Somers; only if that question is answered in the affirmative do the issues of the timing of that hearing and the need for use immunity or the presence of counsel present themselves.

Two recent opinions of the Second Circuit, United States ex rel. Haymes v. Montanye, 505 F.2d 977 (2d Cir. 1974), petition for cert. filed, 43 U.S.L.W. 3282 (U.S. Nov. 1, 1974) (No. 74–520) and Newkirk v. Butler, 499 F.2d 1214 (2d Cir. 1974), cert. granted sub nom. Preiser v. Newkirk, 419 U.S. 894, 95 S.Ct. 172, 42 L.Ed.2d 138 (1974), clearly hold that in many prison transfer situations prison officials are obligated to provide transferees with some form of due process protections. The defendants argue that these decisions do not control the instant case and that their ultimate decision to grant the plaintiff a hearing was purely a matter of administrative grace and not constitutionally compelled. Thus, they argue, any alleged deficiencies in the timing or conduct of the hearing would not rise to the level of a constitutional wrong.

 I disagree with the defendants' conclusion. *Newkirk* clearly established that "[w]here the prisoner suffers substantial loss as a result of the transfer he is entitled to the basic elements of rudimentary due process, i.e., notice and an opportunity to be heard."

499 F.2d at 1217. This is true whether the transfer is viewed by the prison authorities as being for disciplinary or security purposes; the nature of the loss determines the quantum, if any, of the process which is due.[3] *Cf.* Bloeth v. Montanye, 514 F.2d 1192 (2d Cir. 1975). In *Newkirk* the loss suffered by the inmate as a result of the transfer involved, *inter alia*, being located a significantly further distance away from his family and the denial of certain job and training opportunities which were only available at his original institution. When an inmate suffers a loss of that nature, the court held, he is entitled to be informed of the reason for the transfer and be afforded an opportunity to tell his side of any incident which may have precipitated the transfer.[4]

 In the instant case, the loss suffered by the plaintiff, although different, is, if anything, more severe. Upon arriving at Somers, the plaintiff was immediately placed in a cell in the administrative segregation unit in which all recent transferees are housed for a minimum period of thirty days. During that period he was locked in his cell for twenty-four hours a day and denied all privileges accorded inmates in the general population at Somers. At the New Haven jail, he was permitted out of his cell from eight o'clock in the morning until ten o'clock at night. After that initial thirty-day period he was allowed out of his cell for one hour of exercise daily. After the March 7 hearing he was offered the option of returning to the general population. His decision to refuse that offer, however, did not eliminate his claim of continued deprivation.

---

3. United States ex rel. Haymes v. Montanye, *supra*, suggests, however, that where the transfer is for disciplinary purposes the need for due process may be triggered by "the mere fact of dislocation . . . ." 505 F.2d at 981. In view of this court's finding, *see infra*, that the plaintiff did suffer substantial loss as a result of the transfer, it is not necessary to attempt the perilous task of retrospectively ascertaining the defendant's unexpressed motives.

4. Where the reason for the transfer does not involve an incident which the prisoner seeks to vindicate—*e. g.*, to protect the health of the prison population or reduce overcrowding—a statement of the reasons alone, perhaps augmented sometimes by an inspection of the record, should be sufficient to satisfy due process concerns.

At the New Haven jail, he enjoyed both a sense of personal security and the freedom to leave his cell during waking hours and take advantage of institutional programs. At Somers, he is forced to sacrifice one or the other.[5]

The plaintiff was also substantially injured in several other respects. For a period of sixty days, he was automatically denied the right to earn meritorious good time which he had been earning throughout his tenure at the New Haven jail. In addition, he was provided a parole hearing in February and not surprisingly was denied parole. Although there is no direct evidence on this point, it is not unreasonable to infer that this decision was at least partially influenced by notations in the plaintiff's record relating to his alleged involvement in the New Haven jail incident and his subsequent transfer to Somers. Finally, the transfer did make it more difficult for his daughter and cousins, residents of New Haven, to visit him. However, the seriousness of this particular hardship is minimized by the relatively short distance between Somers and New Haven and the availability of a free weekend bus service between these locations.

In the face, then, of these elements of loss, it is quite clear that the defendants were obligated to provide the plaintiff with the due process rights recognized in *Newkirk*, to wit, notice and an opportunity to be heard. However, it is equally clear that such a hearing was not necessarily required prior to the transfer. The court in *Newkirk* recognized that:

> "[U]nder some circumstances there may be compelling reasons for immediate transfer without notice and prior to hearing (e.g., where the transfer is made because of fear of an imminent prison uprising or because of fire, flood, outbreak of an epidemic, or the like) and accordingly . . . 'if prompt action is essential' the hearing may be held as soon after the

transfer 'as practicable.' This . . . permits prison officials to act immediately in instances where notice will touch off the very disturbances which the transfer is designed to avoid." 499 F.2d at 1219.

*See* LaBatt v. Twomey, 513 F.2d 641 (7th Cir. 1975); Morris v. Travisono, 509 F.2d 1358 (1st Cir. 1975); Hoitt v. Vitek, 497 F.2d 598, 600 (1st Cir. 1974); Bowers v. Smith, 353 F.Supp. 1339, 1345 (D.Vt.1972); Urbano v. McCorkle, 334 F.Supp. 161, 168 (D.N.J. 1971), aff'd, 481 F.2d 1400 (3rd Cir. 1973).

Compelling reasons for the plaintiff's transfer without hearing did exist in the present case. Following such a serious incident involving assaultive behavior, it was well within the defendants' wide discretion over security matters, *see* Christman v. Skinner, 468 F.2d 723, 725 (2d Cir. 1972), to determine that the necessary reduction of tensions in the New Haven jail could only be accomplished by the immediate transfer of all those suspected of involvement in the incident. To hold to the contrary would place this court in the untenable position of second-guessing prison administrators who frequently must make difficult but definitive decisions in dealing firmly with situations which threaten prison security.

Under the terms of *Newkirk*, however, the defendants were required to provide the plaintiff with a hearing "as soon after the transfer 'as practicable.'" 499 F.2d at 1219. This the defendants failed to do. While this court recently held that a two-and-one-half-day delay between placement of a prisoner in maximum segregation and the holding of a disciplinary hearing was reasonable, *see* Chetcuti v. Manson, Civ. No. H–40 (D.Conn. April 17, 1975), the delay of two months in the instant case is clearly of a different order. *Cf.* Morris v. Travisono, *supra*. No justification was

---

5. The plaintiff's fear of being attacked by other inmates is not illusory. Apparently the defendants had considered it to be seri-ous enough to transfer him from Somers in September 1972. *See* note 1, *supra*.

offered at trial as to why it would not have been practicable to conduct a hearing very shortly after the plaintiff's transfer to Somers. Rather, defendant Manson testified that the hearing was delayed until a definite decision was made by state prosecutors as to whether to press criminal charges against the plaintiff.[6] He stated that criminal charges will normally issue in approximately two-thirds of those cases referred to the state police for investigation. It was defendant Manson's position that the plaintiff could possibly have benefited from the delay, because had no charges been filed, he could have fully presented his defense at a hearing free of any self-incrimination concerns.

This attempted justification is not acceptable. It is a result of a confused and misguided response to a situation in which the due process rights of the plaintiff were rendered substantially meaningless by the potential filing of criminal charges and the consequent chilling of the plaintiff's right to respond at the disciplinary hearing to the charges against him. Rather than remedying the situation by providing the plaintiff with use immunity for his hearing testimony, the defendants chose to retrench upon his due process rights by delaying the hearing on the unlikely chance that no criminal charges would be filed. This was a basic and constitutionally impermissible misjudgment on their part.

### B.

 Despite this violation, however, this court must deny the plaintiff's request for damages. As an initial consideration, it is quite clear that the eleventh amendment, as construed in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), bars the award of damages against the defendants in their *official* capacities as "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 U.S. at 668, 94 S.Ct. at 1358. *See* Burrell v. Norton, 381 F.Supp. 339, 345 n. 15 (D.Conn.1974). This would apply to any claim for compensatory or nominal damages. In addition, punitive damages would also be barred, at least to the extent they were awarded to punish "malicious actions in gross disregard of a plaintiff's rights." United States ex rel. Motley v. Rundle, 340 F.Supp. 807, 811 (E.D.Pa.1972). If awarded for their deterrent impact, Sostre v. McGinnis, 442 F.2d 178, 205 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S. Ct. 719, 30 L.Ed.2d 740 (1972), punitive damages could possibly avoid the eleventh amendment barrier because of their forward-looking, prospective nature. *Cf.* Class v. Norton, 505 F.2d 123, 126–127 (2d Cir. 1974). However, there is no need to explore that possibility because this court is satisfied that the defendants are prepared in the future to provide speedy transfer hearings without the need for a punitive whip.

 This leaves open the possibility of an award of damages against the defendant Manson in his *individual* capacity.[7] However, although the elev-

---

6. It is true that the bench warrant from the Court of Common Pleas was issued on January 20, 1975. However, defendant Manson testified, and I credit his testimony, that he, the individual responsible for deciding when a transfer hearing would be held, *see* note 7, *infra*, was only first informed of the filing of charges with the issuance of the Superior Court warrant on February 26.

7. Commissioner Manson's testimony clearly established that he alone was factually and legally responsible for both the decisions to transfer the plaintiff and to delay the hearing for the two-month period. This is clear-

ly supported by Conn.Gen.Stat.Ann. § 18–86 (Supp.1975) which provides:

"The commissioner may transfer any inmate of any of the institutions or facilities of the department to any other such institution or facility, irrespective of the institution to which the inmate was originally committed or the length of his sentence when it appears to the commissioner that the best interests of the inmate or the other inmates will be served by such action."

Thus, no cause of action for damages resulting from the delayed transfer was stated against the other defendants.

enth amendment is not available as a bar, *see* Scheuer v. Rhodes, 416 U.S. 232, 237–238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), on this front the plaintiff's claim is met by the defense of a qualified official immunity.

In Wright v. McMann, 460 F.2d 126 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972), the Second Circuit, although not explicitly considering the issue of immunity, did establish the standard for the award of damages against prison administrators. In that case, the court held that a prison administrator was answerable in damages for the injury suffered by an inmate placed in a strip cell held to have been violative of the eighth amendment. Liability would be imposed so long as the prison superintendent knew or should have known of and was ultimately responsible for permitting the unconstitutional conditions. Quoting from Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the court adopted the common law tort standard that "one is liable for the 'natural consequences of his actions.'" Wright v. McMann, *supra*, 460 F.2d at 135. *See* Johnson v. Glick, 481 F.2d 1028 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971).

Even more recently, the court has reaffirmed this view in United States ex rel. Larkins v. Oswald, 510 F.2d 583 (2d Cir. 1975) in which both a warden and the New York commissioner of corrections were held liable under circumstances similar to those involved in Wright v. McMann, *supra*. Once again the court held that knowledge of, either actual or imputed, and ultimate responsibility for the constitutional violation were the necessary prerequisites for the imposition of liability. However, the court was apparently not asked to and did not, in fact, address itself to the impact of Scheuer v. Rhodes, *supra*, upon the scope of the liability of a commis-

sioner of corrections. It is to that inquiry that I now turn.

In *Scheuer*, the Court passed upon the claim of absolute official immunity advanced by the Governor of the State of Ohio, the Adjutant General and his assistant, various named and unnamed officers and enlisted members of the Ohio National Guard and the president of Kent State University in the context of a § 1983 action. Although rejecting the claim of *absolute* immunity, the Court did recognize the need for some form of qualified immunity in the following terms:

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U.S. at 247–248, 94 S.Ct. at 1692.

As an officer of the executive branch of the state government, there can be little doubt that the defendant Commissioner of Correction now enjoys some form of qualified immunity as defined in *Scheuer*. *See* Fidtler v. Rundle, 497 F.2d 794 (3rd Cir. 1974); Saia v. Manson, Civ. No. 15,408 (D.Conn. April 4, 1975).

The flexible standard, quoted above, calls for the balancing of the "scope of discretion and responsibilities of the office" with "the circumstances as they reasonably appeared at the time of the action . . . ." Presumably, the degree of discretion must inform the reviewing court's assessment of the reasonableness of the officer's decision and his claim of good faith. As the scope of discretion broadens, the officer's deci-

sion becomes subject to less rigorous review.

In the case of prison administrators, it has been recognized that they must be accorded "wide discretion . . . in matters of prison discipline and security." Christman v. Skinner, *supra*, 468 F.2d at 725; Mukmuk v. Comm'r of Dep't of Correctional Services, 369 F.Supp. 245, 249 (S.D.N.Y.1974); *cf.* Pell v. Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Furthermore, and perhaps even more importantly, the scope of discretion and responsibilities accorded the commissioner under state law is extremely broad. Conn.Gen.Stat.Ann. § 18–81 (Supp.1975).[8]

In light of this broad discretion, I hold that the commissioner in this case is entitled to the benefit of an official immunity. I do not reach this conclusion without some hesitancy, because the commissioner's actions in delaying the plaintiff's hearing for a two-month period did not meet the normally high standards of judgment which this court has come to expect of the defendant. Nonetheless, on balance I cannot say that the commissioner acted unreasonably in light of all the circumstances, and I am confident that his actions were undertaken in good faith.[9]

As an initial matter, it is clear to this court that the defendant did not act maliciously in postponing the plaintiff's

8. Conn.Gen.Stat.Ann. § 18–81 (Supp.1975) provides:

"The commissioner of correction shall administer, coordinate and control the operations of the department and shall be responsible for the overall supervision and direction of all institutions, facilities and activities of the department. He shall have supervision of parolees. He shall, after consultation with the council, establish rules for the administrative practices and custodial and rehabilitative methods of said institutions and facilities in accordance with recognized correctional standards. He shall be responsible for establishing disciplinary, diagnostic, classification, treatment, vocational and academic education, research and statistics, training and development services and programs throughout the department. Subject to the provisions of chapter 67, the commissioner shall appoint such professional, technical and other personnel as may be necessary for the efficient operation of the department. The commissioner shall organize and operate interinstitutional programs for the development and training of institution and facility staffs. He shall provide for the services of such chaplains as are necessary to minister to the needs of the inmates of department institutions and facilities. He shall act as administrator of the interstate compact for parole and probation supervision established by section 54–133."

9. The defendant, in pressing his claim of immunity, relies upon the standard articulated in Wood v. Strickland, —— U.S. ——, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, that case involved the scope of immunity to be afforded local school officials, and the Court, in its discussion of the issue, made it rather clear that different standards would apply to officials in different branches of or at different levels of government. —— U.S. at ——, 95 S.Ct. 992.

In that respect, it appears from a comparison of the standards applicable to executive branch officials under *Scheuer* and school board members under *Wood* that the former are afforded a broader scope of immunity. A school board member is not immune "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." Wood v. Strickland, *supra*, —— U.S. at ——, 95 S.Ct. at 1001. On the other hand, an official of the executive department can be held liable only if his questioned act was not in good faith or made in the absence of "reasonable grounds for the belief formed at the time and in light of all the circumstances . . . ." Scheuer v. Rhodes, *supra*, 416 U.S. at 247–248, 94 S.Ct. at 1692. Under this latter standard, it is perfectly possible for such an officer to be afforded immunity even though he acted in derogation of a plaintiff's knowable, basic and unquestioned rights, if all the other circumstances surrounding his decision provided a reasonable basis for his decision. Thus, an issue that may be determinative in the case of school board officials is merely one factor in the immunity determination for executive officers.

hearing, but sincerely acted in the belief that the plaintiff's constitutional rights were not being prejudiced by the delay. Turning to the other side of the immunity inquiry, I find, allowing for the defendant's broad scope of discretion, that he had a reasonable basis for his actions under all the circumstances of the case. Although ultimately proven wrong, his judgment that the plaintiff was not entitled to a transfer hearing was not unreasonable. He did not view the transfer as being for disciplinary purposes and thus he could reasonably have discounted the applicability of United States ex rel. Haymes v. Montanye, supra.[10] In addition, he made the not unreasonable, but mistaken, judgment that Newkirk v. Butler, supra was inapplicable because the loss suffered by the plaintiff was not substantial enough to trigger minimal due process protections. Finally, his judgment that the plaintiff would be benefited by a delayed hearing, although incorrect, was based upon the not unreasonable perception that a hearing held when criminal charges were possibly pending would be meaningless to the plaintiff. He did not and was not required to recognize that the provision of use immunity would better solve this constitutional conundrum. A commissioner of correction cannot be "charged with predicting the future course of constitutional law." Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967).

### C.

The plaintiff finally claims that he is entitled to a new hearing at which he must be provided with use immunity and permitted the assistance of retained counsel. The defendants do not now contest the plaintiff's entitlement to use immunity and have indicated their willingness to provide him with a new hear-

ing at which he will be informed of this right. In light of the existing case law on this issue, the defendants' concession is well considered. *See* Melson v. Sard, 131 U.S.App.D.C. 102, 402 F.2d 653 (1968); Dukes v. Gates, Civ. No. H–244 (D.Conn. Dec. 10, 1973); Fowler v. Vincent, 366 F.Supp. 1224 (S.D.N.Y.1973); Sands v. Wainright, 357 F.Supp. 1062 (M.D.Fla.), vacated for lack of jurisdiction, 491 F.2d 417 (5th Cir. 1973); Carter v. McGinnis, 351 F.Supp. 787 (W.D.N.Y.1972) (dictum); *cf.* Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). *But see* Palmigiano v. Baxter, 510 F.2d 534 (1st Cir. 1974); Shimabuku v. Britton, 503 F.2d 38 (10th Cir. 1974).

 The plaintiff, however, also argues that at the rehearing he must be permitted the assistance of counsel. I disagree. The peculiar dilemma which confronts a prisoner in the plaintiff's position, to wit, either being forced to sacrifice his fifth amendment privilege or his due process right to testify at a prison transfer hearing, is ideally resolved by the provision of use immunity. Once an inmate is assured that nothing he says can be used against him at a subsequent criminal prosecution, any real value in having counsel present for fifth amendment purposes is essentially mooted. *See* Fowler v. Vincent, *supra;* Sands v. Wainright, *supra.* *But see* Clutchette v. Procunier, 497 F.2d 809, modified on rehearing on other grounds, 510 F.2d 613 (9th Cir. 1974).

Accordingly, the plaintiff's claim for damages is denied; and, in view of the defendants' expressed willingness to provide the plaintiff with a *prompt* rehearing at which he will be provided with use immunity, there is no present need for the issuance of an injunction. It is

So ordered.

---

10. This is not to suggest that a prison administrator's characterization of a transfer is binding when considering the scope of due process protection to be afforded an inmate. *See* note 3, *supra.*